**CASE FUNDING NETWORK, L.P., 3K Partnership, Prosperity Settlement Funding, Inc., Lawsuit Financial, LLC, Future Settlement Funding Of SC, Inc., New Amsterdam Capital Partners, Inc., Robert M. Press, Ryan Brooks, Joseph Dinardo, Joseph Giurintano, Plaintiff Support Services, Inc., Robert E. Hill, and Anzar Settlement Funding Corp., Appellants,**

v.

**ANGLO–DUTCH PETROLEUM INTERNATIONAL, INC., Anglo–Dutch (Tenge) LLC, and Scott Van Dyke, Appellees.**

No. 01–06–00960–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 9, 2007.

Rehearing Overruled Oct. 5, 2007.

William F. Hagans, Scott G. Burdine, Carl D. Kulhanek, Jr., Hagans Burdine Montgomery, Rustay & Winchester, P.C., Houston, TX, for Appellant Case Funding Network, L.P., et al.

Byron C. Keeling, Keeling & Downes, P.C., Bradley Wayne Hoover, Jack C. Nickens, Jr., Nickens, Keeton, Lawless, Farrell & Flack, L.L.P., Craig T. Enoch, Alejandro Sin Valdes, Winstead PC, Austin, TX, for Appellee Anglo–Dutch Petroleum International, Inc., et al.

Panel consists of Justices TAFT, JENNINGS, and ALCALA.

## OPINION

TERRY JENNINGS, Justice.

Appellants, Case Funding Network, L.P. ("Case Funding"), 3K Partnership ("3K"), Prosperity Settlement Funding, Inc. ("Prosperity"), Lawsuit Financial, LLC ("Lawsuit Financial"), Future Settlement Funding of SC, Inc. ("Future Settlement"), New Amsterdam Capital Partners, Inc. ("New Amsterdam"), Robert M. Press, Ryan Brooks, Joseph DiNardo, Joseph Giurintano, Plaintiff Support Services, Inc. ("Plaintiff Support"), Robert E. Hill, and Anzar Settlement Funding Corp. ("Anzar") (collectively, "the investors"), challenge the trial court's rendition of summary judgment[1] in favor of appellees, Anglo–Dutch Petroleum International, Inc., Anglo–Dutch (Tenge) LLC, and Scott Van Dyke (collectively, "Anglo–Dutch"), in the investors' suit against Anglo–Dutch for breach of contract, fraud, fraudulent inducement,

---

1. *See* TEX.R. CIV. P. 166a(c), (i).

conversion, breach of fiduciary duty, and violation of section 32.45 of the Texas Penal Code [2] arising out of multiple litigation funding agreements (the "investment agreements").

In their first issue, the investors contend that the trial court erred in granting Anglo–Dutch's no-evidence summary judgment motions on the investors' claims for fraud, fraudulent inducement, conversion, breach of fiduciary duty, and violation of section 32.45 of the Texas Penal Code. In their second and third issues, the investors contend that the trial court erred in granting summary judgment in Anglo–Dutch's favor on the ground of accord and satisfaction as to the breach of contract claims brought by investors Case Funding, 3K, Lawsuit Financial, Future Settlement, New Amsterdam, Brooks, DiNardo, Giurintano, Plaintiff Support, and Hill (the "accord investors") and on the ground of release as to the breach of contract claims brought by Press, Anzar, and Prosperity (the "release investors"). In their fourth and fifth issues, the investors contend that the trial court erred in not applying the doctrine of collateral estoppel as to the investors' tort and statutory claims and as to Anglo–Dutch's affirmative defenses of accord and satisfaction and release "given

that [Anglo–Dutch] litigated and lost identical factual issues in a [separate] bench trial before Judge [Lamar] McCorkle involving another investor." [3] In their sixth issue, the investors contend that the trial court erred in granting summary judgment in favor of Van Dyke as to all of the investors' claims.

In a "conditional" cross-appeal,[4] Anglo–Dutch contends in its first, second, and third cross-issues, subject to the trial court's rendition of summary judgment in Anglo–Dutch's favor on its affirmative defenses, that the trial court erred in concluding that the investment agreements were enforceable and valid and that they did not violate public policy, were not usurious loans, were not unregistered securities, and that the investors were not acting "in pari delicto." In its fourth cross-issue, Anglo–Dutch contends that the trial court erred in concluding that "collateral estoppel barred [Anglo–Dutch's] defenses of usury, securities violations, and Texas public policy."

We affirm.

### Factual and Procedural Background

Anglo–Dutch engages in the oil and gas exploration business. Van Dyke is the

---

**2.** Tex. Pen.Code Ann. § 32.45 (Vernon Supp. 2006).

**3.** *See Smith v. Anglo–Dutch Petroleum Int'l, Inc.,* No.2004–48332 (133rd Dist. Ct., Harris County, Tex. March 13, 2006). We note that in the event *Smith* is reversed, there will no longer be a final judgment in that case on which collateral estoppel could be based. *See J.J. Gregory Gourmet Servs., Inc. v. Antone's Import Co.,* 927 S.W.2d 31, 34 (Tex.App.-Houston [1st Dist.] 1995, no writ).

**4.** We need only reach Anglo–Dutch's cross-appeal if we conclude that the trial court erred in granting Anglo–Dutch's summary judgment motion on its affirmative defenses of accord and satisfaction and release. As Anglo–Dutch concedes, this Court, in a case

involving other investors who invested monies with Anglo–Dutch under investment agreements nearly identical to those involved in the instant case, has previously rejected Anglo–Dutch's contentions that these investment agreements are unenforceable on grounds of usury, securities law violations, and public policy. *See generally Anglo–Dutch Petroleum Int'l, Inc. v. Haskell,* 193 S.W.3d 87 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). As further explained, however, our opinion in *Haskell* does not control our consideration of Anglo–Dutch's affirmative defenses in this case because none of the investors in *Haskell* executed a settlement and release agreement or accepted a check with accord and satisfaction language.

president of Anglo–Dutch Petroleum International, Inc. In 2000, Anglo–Dutch filed suit against "Halliburton" and "Ramco" (the "Halliburton lawsuit"),[5] seeking to recover over $600 million in damages for breach of contract and misappropriation of trade secrets arising out of the parties' development of an oil and gas field in Kazakhstan.

Due to the expenses associated with prosecuting the Halliburton lawsuit, and in order "to meet its operating expenses" and "avoid bankruptcy," Anglo–Dutch needed to raise money. Anglo–Dutch initially, but unsuccessfully, sought to borrow money from commercial banks, using the Halliburton lawsuit as collateral. The investors allege in their petition that after Anglo–Dutch was unable to obtain financing from traditional sources, Van Dyke solicited them to enter into Claims Investment Agreements (the "investment agreements"), "which required [Anglo–Dutch] to pay [the investors] a certain sum of money from any cash recovery in the suit against Halliburton."[6]

The summary judgment evidence establishes that, pursuant to the terms of the investment agreements, the investors collectively invested a total of over $700,000. The investment agreements defined the terms of the parties' relationships and set forth formulas for calculating any returns

that the investors would be entitled to receive in the event that Anglo–Dutch obtained a cash recovery.[7] The agreements generally provided that Anglo–Dutch was "selling interests in any Cash Recovery ... that it may receive from the [Halliburton] lawsuit." The agreements also generally stated,

> *Payments by Anglo–Dutch to Investor.* If and only if, a final disposition or settlement of the Lawsuit results in a Cash Recovery to Anglo–Dutch, Anglo–Dutch shall pay (or cause to be paid) to Investor the sum total of:
>
> (a) its Investment, plus,
>
> (b) an amount equal to its Investment, plus
>
> (c) a return on its Investment (hereinafter referred to as the "Investor's Return").....
>
> ....
>
> If a final disposition or settlement of the Lawsuit fails to result (for whatever reason) in a Cash Recovery, then Anglo–Dutch shall have no obligation to make any payment to Investor for any portion of the Investor's Total Return. If the Cash Recovery received by Anglo–Dutch is insufficient to pay all of the Investor's Total Return, Anglo–Dutch shall pay (or cause to be paid) to Investor from the Cash Recovery, only the portion of In-

5. *Anglo–Dutch (Tenge) LLC et al. v. Ramco Oil & Gas, Ltd. et al.*, No.2000–22588 (61st Dist. Ct., Harris County, Tex.).

6. The investors further alleged in their petition that although Anglo–Dutch "settled [its] suit against Halliburton for a substantial sum," Anglo–Dutch "refused to pay all sums owed to [the investors] under their [investment agreements]" and that after its settlement with Halliburton, Anglo–Dutch "falsely informed some or all of [the investors] that many or all of the [other] investors had agreed to accept lower amounts than was owed under [the investment agreements] and, thereby, induced some or all of [the investors]

to accept lesser amounts than was owed to them under their own [investment agreements]."

7. Although the investment agreements differed in some respects, including the amount of the investment and any return, all of the agreements were similarly structured. Also, the formula used to calculate the "Investor's Total Return" varied from agreement to agreement, but the "driving factor" in determining the return was the amount of time that had elapsed from the date of the investment.

vestor's Total Return as is possible by applying all of Anglo–Dutch's portion of the Cash Recovery in accordance with the Order of Payments Schedule ... after which Anglo–Dutch shall have no further liability or obligation to Investor for any portion of its Investor's Total Return remaining unpaid.

. . . .

*Order of Payments Schedule.* ... It is further understood that Investor shall have no claim or right to any portion of the Cash Recovery due or payable to any attorneys retained at any time by Anglo–Dutch.

. . . .

*Time of Payment.* If and when a final disposition or settlement of the Lawsuit results in a Cash Recovery, Anglo–Dutch shall pay (or cause to be paid) to Investor all (or the proportionate share, as the case may be) of its Investor's Total Return in accordance with the Order of Payments Schedule within ten (10) days following Anglo–Dutch's receipt of such Cash Recovery. If such Cash Recovery is received by Anglo–Dutch in installments over time, then Anglo–Dutch (if necessary, because the amounts of such installments are insufficient to pay all the Investor's Total Returns) shall pay Investor its respective Investor's Total Returns in installments (over the same period of time) in accordance with the Order of Payments Schedule, until such time as the Investor's Total Returns (or its proportionate share thereof) shall have been paid in full.

The investment agreements further stated that in the event of Anglo–Dutch's bankruptcy, the investor's interest in any cash recovery would not be described as a debt or obligation of Anglo–Dutch. The agreements granted the investors "a security interest in the amount of the Inves-

tor's Total Return Against Anglo–Dutch's portion of any Cash Recovery," and an "Assignment of Cash Recovery," which was attached to the agreements, stated that "Anglo–Dutch hereby assigns, transfers, and sets over to Investor its proportionate share of Anglo–Dutch's right, title and interest in and to any Cash Recovery ... actually received by Anglo–Dutch from the [Halliburton] Lawsuit ... as continuing and collateral security for the payment of obligation due and owing by Anglo–Dutch to Investor." The investors assert that the assignments and security interests made them "property owners with respect to portions of any Cash Recovery under the agreements."

After the Halliburton lawsuit was tried to a jury, the trial court entered a judgment in the amount of approximately $81 million, including $10 million in attorneys' fees, against Halliburton and Ramco. Van Dyke explained in his affidavit that, at this point, "[t]o make it economically worthwhile for Anglo–Dutch to settle the [Halliburton] Lawsuit" and "[i]n order for Anglo–Dutch to remain in business," Anglo–Dutch needed a "number" of the investors to agree to take less money than specified in the investment agreements. "In other words, for Anglo–Dutch to settle and take less than the judgment amount, some or all of its [investors] needed to do the same." Thus, Van Dyke called "a majority of the lenders and requested they accept less money."

On or about April 12, 2004, Van Dyke, on behalf of Anglo–Dutch, sent a letter to each of the investors. In these letters, Anglo–Dutch noted that, subsequent to the entry of the final judgment in the Halliburton lawsuit, the Texas Supreme Court issued an opinion "impact[ing] Anglo–Dutch's position with respect to the appeals process and the settlement of the lawsuit" and that the trial court entered an

amended final judgment "significantly reducing" the value of its judgment. Anglo–Dutch then stated that "[i]n light of current Texas law, it is Anglo–Dutch's strong desire to settle the case at this time, but for a significantly lower amount than we ever expected." Thus, in order to "achieve a resolution" of the Halliburton lawsuit, Anglo–Dutch "request[ed] everyone who entered into a Claims Investment Agreement to accept a lower payment" than prescribed by the investment agreements. Anglo–Dutch set forth proposed payment terms, a specific payout amount (characterized as a "return on investment"), and an annual percentage rate based "on terms being given to everyone." Anglo–Dutch attached proposed settlement and release agreements to the letters. The April 12, 2004 letters also generally represented that "[m]any of the parties who entered into Claims Investment Agreements have executed their respective Settlement and Releases and returned them to us." The settlement and release agreements provided,

> To induce Anglo–Dutch to accept settlement terms substantially less than Anglo–Dutch had anticipated to receive and/or to help facilitate an early payment between Anglo–Dutch and the defendants in the [Halliburton lawsuit] ... Investor agrees to accept a lower payment from Anglo–Dutch than what is provided for in the Investment Agreements ... All Investment Agreements shall terminate, and, by receiving such money, Investor releases Anglo–Dutch from any and all obligations with respect to the Investment Agreements.

The settlement and release agreements further recited that the agreements were being made "for good and valuable consideration, the sufficiency of which is hereby acknowledged by both parties" and set forth a date certain by which Anglo–Dutch would make the payments. Only the three

release investors—Press, Anzar, and Prosperity—executed the settlement and release agreements. The remaining investors in the instant case rejected Anglo–Dutch's April 12, 2004 settlement request.

On April 16, 2004, Anglo–Dutch and Halliburton entered into a settlement agreement. Although the terms of the Halliburton settlement are undisclosed, the record suggests that the amount of the Halliburton settlement would have been sufficient to pay all of the remaining investors the amounts to which they were entitled under the investment agreements. Anglo–Dutch has not taken the position, at trial or on appeal, that the Halliburton settlement was insufficient to satisfy the amounts owed to the investors pursuant to the provisions of the investment agreements. Regardless of the actual amount of the Halliburton settlement, Van Dyke testified that, around the time of the settlement, he "consulted a lawyer to help in negotiations" with the remaining investors. "[F]ollowing several consultations with the attorney," he "concluded in the first half of April 2004 that the [investment agreements] violated Texas public policy, ... were unenforceable, and were otherwise invalid." Thus, on April 23, 2004, Anglo–Dutch sent the remaining investors letters, which were drafted by Anglo–Dutch's counsel, disputing the validity of the investment agreements. In these letters, Anglo–Dutch stated,

> On Friday, April 16, 2004, *Anglo–Dutch settled with Halliburton* with regard to the Lawsuit. In connection with the Lawsuit and the Agreement, enclosed please find a check in the amount of....
>
> As we communicated to you ..., in light of current Texas law, it was Anglo–Dutch's strong desire to settle the Lawsuit with Halliburton. To achieve

a resolution of the Lawsuit with Halliburton, Anglo–Dutch requested that you accept a lower payment than what is set forth in the Agreement. Notwithstanding recent developments in Texas law and Anglo–Dutch's desire to settle the Halliburton lawsuit, you informed me that you were unwilling to accept a lower payment and that you preferred that the Lawsuit be continued instead of accepting a lower payment.

Your actions put at risk Anglo–Dutch's ability to resolve the Lawsuit with Halliburton. *As such, without waiving any rights or claims it may have, Anglo–Dutch asserts that the Agreement is contrary to Texas public policy and is unenforceable under Texas law, and otherwise disputes its validity.*

(emphasis added). Anglo–Dutch further stated in its April 23, 2004 letters,

*Notwithstanding Anglo–Dutch's contention, and any rights it may have under Texas law, in an effort to compromise any dispute between Anglo–Dutch and you,* Anglo–Dutch has tendered the enclosed check to you. The check is less than the amount called for under the Agreement.

***By depositing the enclosed check, you hereby expressly release Anglo–Dutch from any and all present and future liability relative to the Agreement and the Lawsuit.***

***By depositing the check, you also hereby acknowledge that an "accord and satisfaction" and a "novation" have occurred.*** Anglo–Dutch will be discharged of all liability under the Agreement (of whatever nature), and you may not interpret this fact in any contrary manner whatsoever. Anglo–Dutch shall have no further obligation under the Agreement to you, either in law or in equity.

***Tender of the enclosed check by Anglo–Dutch, and acceptance by you, constitutes full satisfaction of any claim you may have under the Agreement or under Texas law.*** By obtaining payment of the check, you are hereby agreeing to a settlement of the dispute (and the Agreement) for the amount tendered.

This letter, and the restrictive language on the endorsement, constitutes an unmistakable communication to you that the tender of the lesser sum is upon the condition that your acceptance of the enclosed check will constitute satisfaction of Anglo–Dutch's obligation under the Agreement.

. . . .

This letter, and the enclosed check, are being tendered for settlement purposes only.

(emphasis added in first paragraph). Anglo–Dutch wrote on the front of the checks,

PURSUANT TO TEXAS LAW INCLUDING BUT NOT LIMITED TO U.C.C. § 3.311, PAYMENT IS TENDERED IN FULL AND FINAL SATISFACTION OF ALL AMOUNTS DUE AND CLAIMS OR RIGHTS ARISING UNDER THAT CERTAIN CLAIMS INVESTMENT AGREEMENT ... BY AND BETWEEN [ANGLO–DUTCH] AND PAYEE. · BY ENDORSING, NEGOTIATING, DEPOSITING, AND/OR PLEDGING THIS CHECK, PAYEE RELEASES AND DISCHARGES ANGLO–DUTCH, ITS OFFICERS, DIRECTORS, SHAREHOLDERS, MEMBERS, AND EMPLOYEES, AND SCOTT VAN DYKE, INDIVIDUALLY, FROM ANY AND ALL CLAIMS RELATED TO THE AGREEMENT.

Anglo–Dutch wrote on the back of the checks, "PAYEE ACCEPTS AMOUNT TENDERED IN FULL SATISFACTION OF ALL AMOUNTS DUE AND CLAIMS ARISING UNDER THE AGREEMENT, AND AGREES THAT PAYMENT CONSTITUTES A NOVATION AND/OR WAS OBTAINED IN ACCORD AND SATISFACTION."

All of the remaining investors (the accord investors) in the instant case signed and deposited the enclosed settlement checks. However, after receiving and accepting their settlement checks, both the release investors and the accord investors filed the instant suit. In support of their breach of contract claims, the investors alleged that Anglo–Dutch failed to pay them as required by the investment agreements. In support of their fraud claims, the investors alleged that after settling with Halliburton, Anglo–Dutch sent them letters claiming "for the first time" that the investment agreements were against public policy, void, and unenforceable and that the transactions were loans. The investors asserted that since Anglo–Dutch had always represented that the investment agreements were valid investments, Anglo–Dutch fraudulently induced them to enter into the investment agreements. The investors further asserted that after Anglo–Dutch's settlement with Halliburton, Anglo–Dutch represented that "many, most, or all of the other investors had agreed to take discounts off the total amount owed ... and/or had already signed settlement agreements and releases with [Anglo–Dutch]". In support of their penal code and breach of fiduciary duty claims, the investors alleged that Anglo–Dutch was acting in a fiduciary capacity and breached its duties to "safeguard the monies" owed to the investors by disbursing the Halliburton settlement funds without paying them the amounts owed. In support of their conversion claims, the investors alleged that Anglo–Dutch converted the investors' proportionate share of the cash recovery.

The investors and Anglo–Dutch filed multiple summary judgment motions. The investors filed summary judgment motions on their contract claims, and Anglo–Dutch filed summary judgment motions on the grounds that the investors' claims were barred by the affirmative defenses of release and accord and satisfaction. Anglo–Dutch also filed no-evidence summary judgment motions on the investors' tort and statutory claims.

The trial court granted the investors' summary judgment motions "to recover on the contracts" subject to Anglo–Dutch's affirmative defenses. The trial court denied Anglo–Dutch's summary judgment motions "on grounds related to the contract issues," i.e., on grounds that the investment agreements violated Texas public policy, were usurious loans, and were unregistered securities. However, the trial court granted Anglo–Dutch summary judgment on the grounds of accord and satisfaction and release, specifically stating that Anglo–Dutch "established as a matter of law that there was an accord and satisfaction of the underlying debt" between the accord investors and Anglo–Dutch and that the three release investors—Prosperity, Press, and Anzar—"released [Anglo–Dutch] by separate release agreements." Additionally, the trial court granted Anglo–Dutch's no-evidence summary judgment motions on all of the investors' tort and statutory claims "other than fraud in the inducement." The trial court also granted Van Dyke summary judgment "on all claims." However, the trial court stated that the three release investors had raised a "material issue of fact" as to whether they had been "induced by fraud" to enter the settlement and release agreements. Thus, the trial court denied An-

glo–Dutch summary judgment on the release investors' fraudulent inducement claims with respect to the settlement and release agreements.

In sum, in its summary judgment order, the trial court granted Anglo–Dutch and Van Dyke summary judgment against all investors and on all claims, except for the release investors' claims against Anglo–Dutch for fraud in the inducement to enter the settlement and release agreements. The trial court, in a separate order, severed the three release investors' fraudulent inducement claims into a separate action. The accord investors did not assert any similar fraudulent inducement claims with regard to the accord and satisfaction agreements, and, accordingly, none of their claims were severed into the separate action.[8]

## Standard of Review

The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to summary judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). A plaintiff moving for summary judgment on its claim must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.-Houston [1st Dist.] 2006, pet. denied).

When a defendant moves for summary judgment, it must either (1) disprove at least one element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995); *Yazdchi v. Bank One, Tex., N.A.*, 177 S.W.3d 399, 404 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon*, 690 S.W.2d at 548–49; *Yazdchi*, 177 S.W.3d at 403–04. Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in its favor. *Nixon*, 690 S.W.2d at 548–49; *Yazdchi*, 177 S.W.3d at 403–04.

To prevail on a no-evidence summary judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's cause of action. Tex.R. Civ. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex.2004). We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet.). Although the non-moving party is not required to marshal its proof, it must present evidence that raises a genuine issue of material fact on each of the challenged elements. Tex.R. Civ. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d

---

**8.** Both the release investors and the accord investors asserted fraud and fraudulent inducement claims regarding the original investment agreements. These claims were fully disposed of by the trial court's summary judgment order. As noted above, the release investors also asserted fraudulent inducement claims related to the settlement and release agreements, and these are the claims that were severed. The accord investors' did not assert fraudulent inducement claims regarding the accord and satisfaction agreements, and the trial court, in its order, did not permit the accord investors to proceed in the severed action.

598, 600 (Tex.2004). A no-evidence summary judgment motion may not properly be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

## Accord and Satisfaction

In their second issue, the investors contend that the trial court erred in granting summary judgment in Anglo–Dutch's favor as to the accord investors' breach of contract claims on the ground of accord and satisfaction. The investors assert that the trial court "took as true the testimony of Van Dyke" and that fact issues exist as to whether the parties had "a legitimate or bona fide dispute," Anglo–Dutch acted in good faith, and the accords were supported by consideration.

As a preliminary matter, the accord investors contend that the trial court granted Anglo–Dutch summary judgment on its affirmative defenses of accord and satisfaction and release only as to the investors' breach of contract claims. The investors assert that Anglo–Dutch did not seek summary judgment on its affirmative defenses as to their tort and statutory claims. They note that the trial court also disposed of their tort and statutory claims in granting Anglo–Dutch's no evidence summary judgment motions on these claims.

Our review of the record reveals that Anglo–Dutch sought summary judgment on the grounds of accord and satisfaction and release as to all of the accord investors' claims. It is true that at the time Anglo–Dutch filed its original summary judgment motion, the investors had only pleaded breach of contract claims. However, once the investors added their tort and statutory claims, Anglo–Dutch filed supplemental summary judgment motions on the grounds of accord and satisfaction and release. Anglo–Dutch did not limit these supplemental motions solely to the investors' contract claims. Rather, the motions apply to all of the investors' claims, including their tort and statutory claims. Furthermore, the trial court did not state in its order that it granted Anglo–Dutch summary judgment on the basis of accord and satisfaction and release only as to the investors' breach of contract claims. Instead, the trial court, in its order, granted Anglo–Dutch summary judgment on these grounds without any express limitation. In granting Anglo–Dutch's no evidence summary judgment motions, the trial court could simply have been providing an alternative means to dispose of the investors' tort and statutory claims. Accordingly, we reject the investors' procedural challenge to the application of Anglo–Dutch's affirmative defense of accord and satisfaction and release as to their tort and statutory claims.

In regard to whether the affirmative defenses may properly be applied to bar non-contractual claims, Texas courts have noted that "[c]laims arising out of the commission of a tort are particularly applicable subjects for accord and satisfaction." *Marsalis v. Garre*, 391 S.W.2d 522, 525 (Tex.Civ.App.-Amarillo 1965, writ ref'd n.r.e.); *see also Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 863–64 (Tex.2000) (suggesting that accord and satisfaction may bar tort claims, including claims for breach of fiduciary duty, but ultimately holding facts did not support defense). The investors have not cited any authority for the proposition that such defenses apply only to bar their contractual claims. In fact, allowing a party to escape

the effect of entering into an accord and satisfaction agreement by simply pleading non-contractual claims, even when such claims arise out of a dispute that the parties intended to settle by entering into the accord, would defeat the very purpose of this method of dispute resolution, which has long been recognized by the common law and our Legislature. *See* TEX. BUS. & COM.CODE ANN. § 3.311 (Vernon 2002). Accordingly, we will consider the propriety of the trial court's order granting of summary judgment on the ground of accord and satisfaction as to all of the accord investors' claims.

■ The common law defense of accord and satisfaction "rests upon a contract, express or implied, in which the parties agree to the discharge of an existing obligation by means of a lesser payment tendered and accepted." *See Lopez,* 22 S.W.3d at 863; *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969). "The evidence must establish an assent of the parties to an agreement that the amount paid by the debtor to the creditor was in full satisfaction of the entire claim." *Jenkins,* 449 S.W.2d at 455; *Hycarbex, Inc. v. Anglo–Suisse, Inc.,* 927 S.W.2d 103, 108 (Tex.App.-Houston [14th Dist.] 1996, no writ). There must be an unmistakable communication to the creditor that tender of the lesser sum is upon the condition that acceptance will constitute satisfaction of the underlying obligation. *Lopez,* 22 S.W.3d at 863; *Ostrow v. United Bus. Machs., Inc.,* 982 S.W.2d 101, 104 (Tex. App.-Houston [1st Dist.] 1998, no pet.); *Hycarbex, Inc.,* 927 S.W.2d at 108. The condition must be plain, definite, and certain and "the statement accompanying the tender of a sum less than the contract price must be so clear, full, and explicit that it is not susceptible of any other inter-

pretation." *Jenkins,* 449 S.W.2d at 455; *Hycarbex, Inc.,* 927 S.W.2d at 108.

■ An accord and satisfaction of a money demand may occur on payment of an amount less than the creditor contends is due when the claim is unliquidated or when there is a dispute between the parties as to the liability on a liquidated claim. *See Ind. Lumbermen's Mut. Ins. Co. v. State,* 1 S.W.3d 264, 266 (Tex.App.-Fort Worth 1999, pet. denied); *Hixson v. Cox,* 633 S.W.2d 330, 331 (Tex.App.-Dallas 1982, writ ref'd n.r.e.). However, a valid accord and satisfaction requires that there initially be a legitimate dispute between the parties about what was expected. *Lopez,* 22 S.W.3d at 863; *Ostrow,* 982 S.W.2d at 104.

Texas has adopted the Uniform Commercial Code's ("UCC") provisions on accord and satisfaction, which are consistent with the Texas courts' recognition of the common law doctrine of accord and satisfaction.[9] TEX. BUS. & COM.CODE ANN. § 3.311 (Vernon 2002). Section 3.311 provides that a "claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered in full satisfaction of the claim" and that,

(1) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim;

(2) the amount of the claim was unliquidated or subject to a bona fide dispute; and

(3) the claimant obtained payment of the instrument.

*Id.* § 3.311(a)-(b).

■ In regard to the investors' challenges to the existence of a "bona fide

---

9. *See* TEX. BUS. & COM.CODE ANN. § 3.311, cmt. 3 (Vernon 2002) ("Section 3–311 is based on a belief that the common law rule produces a

fair result and that informal dispute resolution by full satisfaction checks should be encouraged.").

dispute," we note that here the parties' accord, which in this case was contained in a written agreement, "is in essence a contract or agreement" and "the rules of construction applicable to contracts apply." *Hycarbex, Inc.*, 927 S.W.2d at 108. Thus, our "primary concern is to ascertain the true intentions of the parties as expressed in the [written] instrument." *Id.; see also AXA S.A. v. Union Pac. R.R. Co.*, 269 F.Supp.2d 863, 867 (S.D.Tex.2003) (stating that when contract is unambiguous, instrument alone will be deemed express intent of parties and court will not look beyond four corners of instrument and that if creditor obviously should understand that check is tendered in full satisfaction then acceptance will be binding regardless of creditor's actual understanding). The April 23, 2004 letters Anglo–Dutch sent the investors plainly disclosed Anglo–Dutch's assertions that the investment agreements were contrary to Texas public policy, unenforceable under Texas law, and otherwise invalid. The letters stated, in no uncertain terms, that notwithstanding these contentions, and "in an effort to compromise any dispute," Anglo–Dutch tendered enclosed checks containing "less than the amount called for" under the investment agreements. The letters emphasized, by using bold and underlined text, that by depositing the enclosed checks, the investors would be releasing Anglo–Dutch from liability and that an accord and satisfaction would occur. The checks attached to the letters contained unmistakable accord and satisfaction language on both the front and the back.

After receiving the April 23, 2004 letters, stating that Anglo–Dutch disputed the validity of the investment agreements, all of the accord investors signed and deposited the enclosed checks. *See Indus. Life Ins. Co. v. Finley*, 382 S.W.2d 100, 106 (Tex.1964) (stating that notation on check and statement of basis of tender in transmittal letter were clear and unequivocal offer of accord); *AXA S.A.*, 269 F.Supp.2d at 867 (noting that letter accompanying settlement check included conspicuous statement that instrument was tendered in full satisfaction and that pertinent language describing enclosed check as limit of liability was on front of one-page letter and "not hidden within boilerplate language or mislabeled headings" and concluding that defendant established defense of accord and satisfaction as matter of law). Furthermore, the enclosed checks referenced, in all capital letters, section 3.311 and repeatedly stated that Anglo–Dutch's payment was being tendered in full satisfaction of all amounts due under the investment agreements—the validity of which Anglo–Dutch was disputing. *See Ostrow*, 982 S.W.2d at 104 ("When a check listing certain conditions is tendered to a party and the conditions are accepted, a contract is formed when the check is cashed or deposited.").

None of the investors presented any evidence disputing that they received the April 23, 2004 letters communicating Anglo–Dutch's position regarding the enforceability of the investment agreements. For example, the summary judgment record contains testimony from multiple investors acknowledging that the letters unambiguously communicated Anglo–Dutch's position. In fact, some of the investors admitted to consulting with counsel prior to accepting the checks with the accord and satisfaction language. One of the investors deposited the check only after disputing Anglo–Dutch's accord and satisfaction language by stating, "With all rights reserved against all Parties and under protest." [10] This protest language provides

---

**10.** Under Texas law, any such language is ineffective, and a creditor is required to re-

additional evidence that the investors were aware of Anglo–Dutch's position as stated in its April 23, 2004 letters.

Other summary judgment evidence, beyond the plain terms of the accord itself, also establishes the existence of a bona fide or legitimate dispute. Van Dyke testified that in the first half of April 2004, apparently after his initial April 12 correspondence to investors, and following consultations with his lawyer, he concluded that the investment agreements violated Texas public policy and were unenforceable. Van Dyke conceded that although he is "not a lawyer or an expert on the law of contracts, securities, usury, or Texas public policy," both he and Anglo–Dutch maintained a reasonable belief that Anglo–Dutch would prevail on its claims that the investment agreements violated Texas public policy and were invalid. Thus, according to Van Dyke, "Anglo–Dutch disputed its liability . . . in good faith on April 23, 2004."

We further note that at the time Anglo–Dutch disputed its liability, no Texas court had yet addressed similar challenges to litigation funding agreements in Texas. *See Haskell*, 193 S.W.3d at 100. Additionally, courts in other states had found certain types of litigation funding agreements to be unenforceable. *Id.* at 100 (citing *Lawsuit Fin., L.L.C. v. Curry*, 261 Mich. App. 579, 683 N.W.2d 233 (2004) and *Rancman v. Interim Settlement Funding Corp.*, No. 20523, 2001 WL 1339487, at *3 (Ohio Ct.App. Oct. 31, 2001) (not designated for publication)).

Additionally, the deposition testimony from multiple investors in this case establishes that the investors had reason to be aware of these decisions from other jurisdictions and to anticipate at least some measure of risk regarding the enforceability of the investment agreements. Specifically, Dinardo, both an individual investor and a corporate representative for Plaintiff Support, testified,

> [Anglo–Dutch]: And Mr. Van Dyke, on behalf of Anglo–Dutch, raised in this letter that he felt like the claims investment agreements were—violated Texas public policy and were unenforceable and void, correct?
>
> [Dinardo]: He said that, yes.
>
> [Anglo–Dutch]: So he raised, at least in this letter, a dispute as to the validity of the contracts?
>
> [Dinardo]: Yes, for the first time.
>
> . . . .
>
> [Anglo–Dutch]: So you read this letter, and he has language in here that is basically offering to you a settlement or a new contract, right?
>
> [Dinardo]: Correct.
>
> [Anglo–Dutch]: But you would agree with me that at least as of today it's not really settled law in a lot of the states whether or not these types of agreements are going to be found enforceable, correct?
>
> . . . .
>
> [Dinardo]: And those are the states we don't do business in, correct.
>
> [Anglo–Dutch]: Well, there's a lot of states where you don't have, for exam-

---

turn the check without cashing it. *See Ind. Lumbermen's Mut. Ins. Co. v. State*, 1 S.W.3d 264, 267 (Tex.App.-Fort Worth 1999, pet. denied); *see also Hixson v. Cox*, 633 S.W.2d 330, 331 (Tex.App.-Dallas 1982, writ ref'd n.r.e.) ("Acceptance of a lesser amount, even under protest, . . . results in an accord and satisfaction which is binding on the creditor

and precludes recovery for any unpaid amount."); TEX. BUS. & COM.CODE ANN. § 3.311, cmt. 2 (noting that "[u]nder the common law rule the seller can refuse the check or can accept it subject to the condition stated by the buyer, but the seller can't accept the check and refuse to be bound by the condition").

ple, supreme court opinion these specifically are [ ] enforceable?

[Dinardo]: You're right.

. . . .

[Anglo–Dutch]: You knew the risk was there?

. . . .

That the contract could be held unenforceable?

. . . .

[Dinardo]: I think that is an element of the business, yes.

[Anglo–Dutch]: We've talked about, you know, the possibilities at least in certain states in certain circumstances these contracts would be considered usury and therefore violate usury law, right?

[Dinardo]: Yes.

. . . .

[Anglo–Dutch]: And again, you know that there's a risk out there and that some state or some judge could hold these contracts invalid or unenforceable due to public policy?

[Dinardo]: On a state-by-state basis, that's correct.

In response to the above summary judgment evidence, the investors cite to evidence showing that Anglo–Dutch, in an attempt to accomplish its settlement with Halliburton after obtaining a "significantly lower than expected" judgment, solicited the investors to take reduced payouts with the motivation that it wanted to retain more of the settlement funds. But this evidence, indicating only that Anglo–Dutch sought to reduce its liabilities and better its economic standing, does not defeat the summary judgment evidence that, on April 23, 2004, Anglo–Dutch presented a legitimate and bona fide dispute as to the validity of the investment agreements on public policy grounds and that Anglo–Dutch clearly communicated this dispute to the investors.

In regard to the issue of good faith, the comments to section 3.311 define "good faith" to mean "not only honesty in fact, but the observance of reasonable commercial standards of fair dealing." TEX. BUS. & COM.CODE ANN. § 3.311, cmt. 4. The comments further note that the "meaning of 'fair dealing' will depend upon the facts in the particular case." *Id.* The comments provide two examples of a lack of good faith. *Id.* First, when an insurer takes unfair advantage of a claimant by tendering a settlement check for "a claim for personal injury in an accident *clearly covered* by the insurance policy" and the "claimant is necessitous and the amount of the check is very small in relationship to the extent of the injury and the amount recoverable." *Id.* (emphasis added). On those facts, if "the insurer was taking *unfair advantage* of the claimant, an accord and satisfaction would not result from payment of the check because of the absence of good faith by the insurer in making the tender." *Id.* Second, "lack of good faith is found in the practice of some business debtors in routinely printing full satisfaction language on their check stocks so that all or a large part of the debts of the debtor are paid by checks bearing the full satisfaction language, whether or not there is any dispute with the creditor." *Id.* "Under such a practice the claimant cannot be sure whether a tender in full satisfaction is or is not being made." *Id.* "Use of a check on which full satisfaction language was affixed routinely pursuant to such a business practice may prevent an accord and satisfaction on the ground that the check was not tendered in good faith." *Id.*

Neither of these examples is comparable to the facts of this case. Here, we cannot say that Anglo–Dutch's challenge to the validity of the agreements was frivolous or

completely without merit. Additionally, the record contains no evidence that would support a finding that, like an insurer taking unfair advantage of a needy claimant who was clearly covered by an insurance policy, Anglo–Dutch was taking advantage of the accord investors. *See Gen. Am. Life Ins. Co. v. Valley Feed Mills, Inc.,* 458 S.W.2d 860, 862 (Tex.Civ.App.-El Paso 1970, writ ref'd n.r.e.) (indicating that accord and satisfaction would not be available defense if denial of claim is "factitious or mala fides"). Furthermore, the record contains no evidence that the language in the April 23, 2004 letters and the enclosed checks was merely boilerplate and included by Anglo–Dutch as a routine business practice. Instead, the checks contained conspicuous language, and the checks were accompanied with cover letters clearly setting forth Anglo–Dutch's dispute regarding the validity of the investment agreements and an offer to settle the dispute.

Other evidence concerning representations made to and relied upon by the release investors is largely unrelated to the April 23, 2004 letters containing the accord and satisfaction language, which is the focus of our inquiry. *See Hycarbex, Inc.,* 927 S.W.2d at 108; *AXA S.A.,* 269 F.Supp.2d at 867. For example, the accord investors cite evidence regarding specific representations made by Anglo–Dutch and relied upon by the release investors, both in the April 12, 2004 letters and in separate conversations, inducing the release investors to enter into the settlement and release agreements. Also, the accord investors cite evidence showing that Anglo–Dutch contacted the release investors and told them that, in order to obtain a settlement with Halliburton, all investors would have to accept the deal or get nothing and that many or all of the other investors had already agreed to take discounted payments. But whatever representations were made to and relied upon

by the release investors in entering into the settlement and release agreements, the accord investors did not enter into similar settlement and release agreements. We also note that the release investors' fraudulent inducement claims arising out of these alleged misrepresentations made to induce the release investors to enter into the settlement and release agreements have been severed into a separate action.

Thus, even though there is some evidence showing that Anglo–Dutch had previously, and possibly falsely, represented that it needed *all* of the investors to accept reduced payments so that it could accomplish a settlement with Halliburton, Anglo–Dutch disclosed in the first line of its April 23, 2004 letters that it had in fact settled the Halliburton lawsuit on April 16, 2004. This disclosure rendered any prior representations regarding its need for all of the investors to accept reduced payments to effectuate a settlement with Halliburton immaterial to the accord investors' decision to accept the settlement checks with the accord and satisfaction language. In sum, evidence regarding the previous representations made in an attempt to induce the investors to take reduced payments to enable Anglo–Dutch to settle with Halliburton in exchange for the promise of a quick payout does not create a fact issue as to whether the accord investors were put on notice of a legitimate or bona fide dispute as to the enforceability of the investment agreements in the April 23, 2004 letters.

Similarly, the investors' argument that there can be no legitimate or bona fide dispute because this Court rejected "every assertion" made by Anglo–Dutch regarding the validity of the investment agreements in *Haskell* does not raise a fact issue as to whether Anglo–Dutch, in good faith, raised a legitimate or bona fide dispute in its April 23, 2004 letter. In evalu-

ating the existence of a bona fide dispute or the good faith of Anglo–Dutch, we do not consider whether Anglo–Dutch's arguments ultimately proved wrong. *See Vann v. W. Data Ctrs., Inc.*, 532 S.W.2d 419, 421 (Tex.Civ.App.-Amarillo 1976, no writ) (stating that it was unnecessary to decide defendant's actual liability, bona fide dispute made it immaterial as to what plaintiffs were otherwise entitled to receive, and that when defendant "explained its position and offered its check with the release affixed in full satisfaction" plaintiffs knew defendant was disputing its liability on claims and was making unequivocal offers of lesser amount in full and final settlement); *Gen. Am. Life Ins. Co.*, 458 S.W.2d at 862 (stating that "validity of the accord and satisfaction is not affected by the fact that the party who claimed that nothing is due, or that the true sum was less than that claimed by the other party, is subsequently shown to have been in error"). Here, regardless of whether the investment agreements were ultimately deemed to be enforceable, at the time the accord investors chose to accept the settlement checks, they accepted the terms of the accord "unaffected by their belief" that Anglo–Dutch's contentions lacked merit. *See Vann*, 532 S.W.2d at 422.

We conclude that the investors' evidence does not create a fact issue as to whether the parties had "a legitimate or bona fide dispute" or whether Anglo–Dutch acted in good faith at the time Anglo–Dutch sent the April 23, 2004 letters and the investors accepted the tendered checks.

■■■ In regard to the investors' claim that the new agreements were not supported by consideration, Texas law is clear that a "good faith dispute as to liability on either a liquidated or unliquidated claim furnishes sufficient consideration for an accord and satisfaction," and the satisfaction is the "actual performance of the new agreement." *Hycarbex, Inc.*, 927 S.W.2d at 110; *Ind. Lumbermen's Mut. Ins. Co.*, 1 S.W.3d at 266. In determining whether an accord and satisfaction is supported by consideration, "it is not necessary to resolve the parties' underlying dispute." *Hycarbex, Inc.*, 927 S.W.2d at 110. Rather, consideration "is found in the resolution of the uncertainty which exists as to the validity or the amount of a claim" and "the very existence of the dispute is the consideration for the accord and satisfaction." *Id.* Because the summary judgment evidence establishes that Anglo–Dutch communicated its bona fide dispute to the investors in its April 23, 2004 letters, we conclude that the new agreements were supported by consideration. *See id.*

■■■ Finally, the investors argue that Anglo–Dutch's accord and satisfaction defense fails because the investors' claims are liquidated. Both the common law standard and section 3.311 make clear that an accord and satisfaction may arise in the context of a liquidated claim. *See Ind. Lumbermen's Mut. Ins. Co.*, 1 S.W.3d at 266 (stating that accord and satisfaction may occur when claim is unliquidated or when there is dispute between parties as to liability on liquidated claim); TEX. BUS. & COM.CODE ANN. § 3.311 (stating that amount of the claim must be "unliquidated *or* subject to a bona fide dispute") (emphasis added).

We hold that Anglo–Dutch established, as a matter of law, its affirmative defense of accord and satisfaction as to the accord investors' claims. Accordingly, we further hold that the trial court did not err in granting summary judgment in Anglo–Dutch's favor as to all of the accord investors' claims on the ground of accord and satisfaction.

We overrule the investors' second issue.

### Release

In their third issue, the investors contend that the trial court erred in granting summary judgment in Anglo–Dutch's favor as to the release investors on the ground of release.

The summary judgment evidence establishes that on or about April 12, 2004, prior to finalizing a settlement with Halliburton and obtaining any cash recovery, Van Dyke sent the investors letters "respectfully requesting" them to accept reduced payments and attaching proposed settlement and release agreements. The letters stated that the trial court in the Halliburton lawsuit signed a judgment that "significantly reduced the value" of the judgment. The letters also noted that recent developments in Texas law, subsequent to the trial court's entry of its judgment, had "impacted Anglo–Dutch's position with respect to the appeals process and the settlement of the Lawsuit." As such, and "[i]n light of current Texas law," Anglo–Dutch expressed its "strong desire" to settle, and Anglo–Dutch also noted Halliburton's "willingness to settle," but for "a significantly lower amount than what we ever expected." Anglo–Dutch asserted that "to achieve a resolution of the Lawsuit with Halliburton," it needed "everyone" to accept discounted payments. In sum, the letters made clear that the investors were being asked to accept discounted payments to avoid any risks associated with the enforceability of the judgment and to obtain a quick payout.

Only the three release investors signed and returned the settlement and release agreements, which provided that "[t]o induce Anglo–Dutch to accept settlement terms substantially less than Anglo–Dutch had anticipated to receive and/or to help facilitate an early payment between Anglo–Dutch and the defendants in the [Halliburton lawsuit] . . . Investor agrees to accept a lower payment from Anglo–Dutch than what is provided for in the Investment Agreements." Thus, each settlement and release agreement specifically provided that its execution would induce settlement and facilitate "early payment." Each settlement and release agreement provided a sum certain that Anglo–Dutch would pay the investors and a date certain by which it would make the payment. The settlement and release agreements also recited that they were being made "for good and valuable consideration." Furthermore, the settlement and release agreements stated that the investment agreements "shall terminate" and that Anglo–Dutch was released from any and all obligations with respect to the investment agreements.

Here, the release investors entered into the settlement and release agreements before Anglo–Dutch's settlement with Halliburton and at a time when there was some concern about the prospect of the appeals process and the ultimate recovery. The release investors signed the settlement and release agreements to avoid any of the uncertainty and to ensure a prompt payout on a date certain and of a sum certain. Thus, the settlement and release agreements were supported by consideration. *See Hycarbex, Inc.*, 927 S.W.2d at 110 (noting that consideration "is found in the resolution of the uncertainty which exists as to the validity or the amount of a claim").[11]

11. Rather than address any of the above evidence, as their sole argument that the trial court erred in granting summary judgment on the ground of release, the investors cite the other trial court's finding of fact in *Smith*—a case involving another investor, Smith, who is not a party to this appeal. Specifically, the investors cite the trial court's finding in *Smith* that "there was no consideration for any proposed settlement agreement between Smith

Accordingly, we hold that the trial court did not err in granting summary judgment in Anglo–Dutch's favor as to all of the release investors' claims on the ground of release.[12]

We overrule the investors' third issue.

### Collateral Estoppel

In their fourth and fifth issues, the investors contend that the trial court erred in failing to apply the doctrine of collateral estoppel as to Anglo–Dutch's accord and satisfaction and release defenses and as to the investors' tort and statutory claims "given that [Anglo–Dutch] litigated and lost identical factual issues in a [separate] bench trial before Judge [Lamar] McCorkle involving another investor."

 Collateral estoppel can be applied offensively or defensively. *Yarbrough's Dirt Pit, Inc. v. Turner*, 65 S.W.3d 210, 216 (Tex.App.-Beaumont 2001, no pet.). A plaintiff uses offensive collateral estoppel when he seeks to estop a defendant from relitigating an issue that the defendant previously litigated and lost in a suit involving another party. *See id.* To establish collateral estoppel or issue preclusion, the claimant must show: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, (2) those facts were essential to the judgment in the first ac-

tion, and (3) the parties were cast as adversaries in the first action. *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 579 (Tex.2001); *Turnage v. JPI Multifamily, Inc.*, 64 S.W.3d 614, 617 (Tex.App.-Houston [1st Dist.] 2001, no pet.).

In regard to the application of collateral estoppel on Anglo–Dutch's affirmative defenses of accord and satisfaction and release, the investors cite the following findings of fact from the other trial court in the *Smith* case:

58. Moreover, there was no consideration for any proposed settlement agreement between Smith and Anglo–Dutch;

59. At the time Anglo–Dutch requested Smith and other investors to take less than was set forth in the contracts, there was no bona fide dispute between Anglo–Dutch and the investors, including Smith.

However, in addition to the above findings, the trial court further found in *Smith*,

55. Smith has never executed a settlement agreement in connection with his claims against Anglo–Dutch.

56. No final settlement agreement was ever agreed upon by Smith and Anglo–Dutch.

and Anglo–Dutch." The investors assert that this finding "at a minimum raises a fact issue as to whether the releases are supported by consideration and therefore enforceable irrespective of whether Press, Anzar, and Prosperity were fraudulently induced to sign them."

However, as Anglo–Dutch notes, in *Smith*, the trial court also made findings of fact that Smith never signed a settlement agreement with Anglo–Dutch and that Anglo–Dutch withdrew all settlement offers. Thus, the trial court's finding that the investor in *Smith*—who is not a party to this

appeal—received no consideration from a settlement agreement, does not raise a fact issue on Anglo–Dutch's affirmative defense of release in this case.

12. As with Anglo–Dutch's affirmative defenses of accord and satisfaction, we conclude that Anglo–Dutch sought summary judgment on the affirmative defense of release as to all of the release investors' claims—contract, tort, and statutory. Thus, we consider the propriety of the trial court's order granting summary judgment on the ground of release as to all of the release investors' claims.

57. In any event, Anglo–Dutch withdrew all settlement offers that it had ever made to Smith.

Thus, unlike the investors in this case, Smith neither signed a settlement and release agreement nor accepted a check with accord and satisfaction language. Only after making the above critical findings, did the trial court in *Smith* find, with a qualifying "moreover," that there was no consideration or a bona fide dispute. In addition to these key differences between this case and *Smith*, it appears that although Anglo–Dutch pleaded the affirmative defense of release in *Smith*, it did not, at any time, assert the affirmative defense of accord and satisfaction. Of course, there would have been no basis to assert such a defense in *Smith* since Smith, as evidenced by the trial court's findings, did not accept the April 23, 2004 check with the clear and unmistakable accord and satisfaction language.

■■■ Even if the investors' and Smith's investment agreements and breach of contract claims were effectively identical, and even if Anglo–Dutch had pleaded counterclaims for breach of contract in this case and *Smith*, the summary judgment record does not conclusively establish that the issues of "bona fide dispute" and "consideration," as those issues are raised in this case, were fully and fairly litigated in *Smith*. Additionally, since it was found in *Smith* that there was never any settlement or release between Anglo–Dutch and Smith, any findings regarding the existence of a bona fide dispute or the lack of consideration were not essential to the judgment. *See French v. Gill*, 206 S.W.3d 737, 745 (Tex.App.-Texarkana 2006, no pet.) (stating that "the general rule is that there cannot be estoppel by alternative holdings"); *see also* RESTATEMENT (SECOND)

OF JUDGMENTS § 27 cmt. i (1982) ("If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone."); *Cf. Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 522 (Tex. 1998) (concluding that "alternative findings that are in fact reviewed and affirmed by an appellate court may have preclusive effect"). Accordingly, we hold that the trial court did not err in refusing to apply the doctrine of collateral estoppel as to Anglo–Dutch's accord and satisfaction and release defenses.

We overrule the investors' fourth issue.

Having held that the trial court did not err in refusing to apply the doctrine of collateral estoppel as to Anglo–Dutch's accord and satisfaction and release defenses, that Anglo–Dutch established as a matter of law its accord and satisfaction and release defenses, and that such defenses applied to all of the investors' claims, we need not consider the investors' fifth issue regarding the application of collateral estoppel on the investors' tort and statutory claims. We also need not consider the investors' first issue, in which they argue that the trial court erred in granting Anglo–Dutch's no-evidence summary judgment motions on the investors' tort and statutory claims.

### Claims Against Van Dyke Individually

In their sixth issue, the investors contend that the trial court erred in granting summary judgment in favor of Van Dyke as to all of the investors' claims. Based on the rule that corporate agents are personally liable for fraudulent or tortious acts

committed while in the service of their corporation,[13] the investors assert that because the summary judgment evidence shows that every fraudulent or tortious act was performed by Van Dyke, it follows that fact issues exist as to their tort and statutory claims against Van Dyke individually for the same reasons that fact issues exist as to their claims against the corporate Anglo–Dutch defendants. The investors do not assert that the terms of the settlement and release agreements or the accord are insufficient to release any claims that the investors had against Van Dyke in his individual capacity.

Having held that Anglo–Dutch established as a matter of law its accord and satisfaction and release defenses and that such defenses apply to all of the investors' claims, we further hold, for the same reasons set forth above, and based on the affirmative defenses of accord and satisfaction and release, that the investors did not present fact issues as to these same claims against Van Dyke in his individual capacity.

We overrule the investors' sixth issue.

### Conclusion

In light of our holding that the trial court did not err in refusing to apply the doctrine of collateral estoppel as to Anglo–Dutch's accord and satisfaction and release defenses, that Anglo–Dutch established as a matter of law its accord and satisfaction and release defenses, and that such defenses applied to all of the investors' claims, we need not consider Anglo–Dutch's cross-appeal.

13. *See Centurion Planning Corp., Inc. v. Seabrook Venture II,* 176 S.W.3d 498, 509 (Tex.

We affirm the judgment of the trial court.

App.-Houston [1st Dist.] 2004, no pet.).