COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                               NO.
02-09-00368-CV

 

 

AMERICAN HAT COMPANY                                                      APPELLANT
AND

 
APPELLEE

 

                                                             V.

 

WISE ELECTRIC
COOPERATIVE, INC.                                        APPELLEE AND

                                                                                                APPELLANT

------------

 

              FROM
THE 97TH DISTRICT COURT OF MONTAGUE
COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I. 
Introduction

In
three issues, Appellant/Cross-Appellee American Hat Company (AHC) asserts that 1) the trial court erred by not taking
judicial notice of its judgment in a companion case, 2) the trial court erred
by admitting AHC=s
tax records, and 3) the jury finding pertaining to market value was against the
great weight and preponderance of the evidence. 
Because we reverse and remand for a new trial, we do not reach
Cross-Appellant/Appellee Wise Electric Cooperative, Inc.=s
(Wise=s)
issues.  See Tex. R. App. P. 47.1.

II.  Factual and Procedural History

On
November 27, 2005, a wildfire occurred in and around Bowie, burning 900 to
1,200 acres.  Bowie=s
fire chief, Doug Page, determined that the fire began at a utility pole owned
by Wise, caused by a Aconductor [that] had come
loose from a splice and contacted the ground rod[,]@ and
resulting in molten material falling onto grass near the pole.

A.  AHC and Travelers=s
Companion Case

In
2006, AHC, which owns a manufacturing plant in Bowie,
submitted a claim to its insurance company, The Travelers Lloyds Insurance
Company (Travelers), asserting that smoke and soot from the 2005 wildfire
resulted in inventory loss, building damage, and lost profits.  The trial court appointed an umpire pursuant
to an Aappraisal@
provision in AHC=s
insurance contract to determine the value of the loss.  The umpire awarded AHC
$8,792,529 for inventory loss, $312,145.72 for building damages, and $332,921
for lost profits.  The trial court,
finding no objections to the umpire=s
award, found that the award was final and binding.  Travelers ultimately paid AHC
approximately $2.6 million, including $2 million for inventory (policy limits).


B.  AHC and Wise
(Pretrial)

One
year later, AHC filed suit against Wise for
negligence, alleging that the damage to its building and contents, including
inventory, was Aat least $10 [million].@  Travelers intervened, asserting its
subrogation rights to the first $2.6 million of any recovery obtained by AHC.

Before
trial, Wise reached a mediated settlement agreement with Travelers, in which
Travelers, for $1.9 million, agreed to release its claim against Wise and to
assign to Wise Aits entire priority claim
interest in the amount of [$2.6 million] from any recovery by [AHC].@

Also
prior to trial, AHC filed a motion asking the trial
court to take judicial notice of its order ratifying the $8,792,529 appraisal
award in the companion case.  After a
hearing on the matter, the trial court denied AHC=s
motion.

C.  Evidence at Trial

In
addition to evidence of liability, the jury also received the following
evidence pertaining to damages.   

1.  Testimony of Keith Maddox, AHC=s
Owner

Keith
Maddox purchased AHC out of foreclosure in 2003,
paying $350,000 for AHC=s
inventory and equipment.  Around a year
later, he moved AHC=s
manufacturing plant from Conroe to Bowie. 
On the day of the fire in November 2005, AHC
had 490,092 hats in its inventory, totaling $2 million worth of inventory
inside the plant and $11 million worth of inventory in sealed containers in the
parking lot.  All 490,092 hats had smoke
damage as a result of the fire and were not sellable.[2]

The
damaged hats were either felt or straw and were in one of three stagesCstage
one, Araw
bodies@;
stage two, finished hats that needed the name and sweatband added to the
inside; and stage three, finished hats ready to be shipped.  Because it takes anywhere from six months to
a year to obtain raw bodies from overseas, AHC lost
customers after the fire due to a lack of inventory.[3]

The
Montague County tax appraisal records listed AHC=s
inventory and equipment at $200,000 as of January 1, 2005, and at $105,000 as
of January 1, 2006.  When questioned
about Montague County=s tax appraisal requirement
that local businesses report the actual value for new inventory and the market
value for old inventory, Maddox conceded that AHC
reported a value of $200,000 for its inventory and equipment in January 2005
and that he could not recall AHC ever reporting a
value of a million dollars or more for its inventory.

2.  Testimony of Gary Moore, Retired Hatco Employee

Gary
Moore, a retired employee of one of AHC=s
competitors with over twenty-six years of experience in the hat industry, had
been hired to inspect the damaged hats and to give his opinion on them.[4]  He opined that all of AHC=s
hats were smoke-damaged, water-damaged, or both.  Based on his experience, a hat with smoke
damage could not be cleaned, and, even if the hats could be cleaned, they could
not be sold as new. 

3.  Testimony of Steve Startz,
Owner of Startz Insurance Salvage

AHC
hired Steve Startz to determine the replacement cost
of AHC=s
inventory immediately before the fire.  Startz determined the actual cost of producing each hat at
the various stages of production from AHC=s
2005 invoices, profit and loss statements, and tax records.

In
2005, AHC calculated an inventory loss of $8.7
million.  Three years later, AHC submitted a new calculation, showing an inventory loss
of approximately $10 million.  Startz later found errors in the previous calculations and
submitted a new amount of $13,385,969.37.

At
trial, Startz testified that based upon his
education, experience, and investigation, he concluded that the total
replacement cost would be $13,385,969.37, based on the following calculations:


 
 
  
 Hat Type
 
 
  
 Number of Hats
 
 
  
 Cost per Hat
 
 
  
 Replacement Cost
 
 
 
 
  
 Stage 1 Felt
 
 
  
   38,670
 
 
  
 $  40.25
 
 
  
 $1,556,467.50
 
 
 
 
  
 Stage 2 Felt
 
 
  
   63,381
 
 
  
 $123.58
 
 
  
 $7,832,623.98
 
 
 
 
  
 Stage 3 Felt
 
 
  
     4,574
 
 
  
 $137.11
 
 
  
 $   627,141.14
 
 
 
 
  
 Stage 1 Straw
 
 
  
 345,870
 
 
  
 $    5.43
 
 
  
 $1,878,074.10
 
 
 
 
  
 Stage 2 Straw
 
 
  
   23,701
 
 
  
 $  39.25
 
 
  
 $   930,264.25
 
 
 
 
  
 Stage 3 Straw
 
 
  
  13,896
 
 
  
 $  40.04
 
 
  
 $   561,398.40
 
 


4.  Testimony of Shannon Henry Shipp, Ph.D.

AHC
hired Shannon Henry Shipp, Ph.D., a partner of a firm that provides economic
analysis and calculations for litigation support, to calculate AHC=s lost profits.[5]  Although he did not have any prior experience
with the hat manufacturing process, Dr. Shipp calculated $5,774,923 as total
lost profits for AHC from 2005 to 2011.[6]

To
calculate AHC=s
lost profits, Dr. Shipp Ahad several conversations
with Mr. Maddox over time, also met with several folks at his company, and . .
. talked about everything from how many people there were and how theyChow
those folks were organized, production people, financial people, office people.@  Most of the background information he used to
calculate AHC=s
lost profits came from Maddox and Startz.  Dr. Shipp testified that he considered
seasonal sales as well as the different types of entities AHC
sold toCstand
alone stores, chain stores, and individuals. 
He based future projections on past sales, testifying that these Aprojections
and forecasts have a margin of error [and] . . . hitting something exactly on
the number, probably that=s not going to happen;
within a range, probably.@

Dr.
Shipp testified that AHC had problems filling its
orders prior to the fire.  AAccording
to Mr. Maddox, Cavend[e]r=s
had purchased large orders for several locations, several Cavend[e]r=s
locations, in the months before [AHC] moved to Bowie,
Texas.  When the factory was closed for
the remodel and training the workforce, AHC was
unable to meet all the delivery deadlines.@

5.  Testimony of Dennis McBay,
CPA[7]

Wise
hired Dennis McBay to evaluate AHC=s
lost profits and extra expense loss.  McBay reviewed historical sales, sales orders, historical
financial statements, and shipping information. 
He calculated AHC=s
lost profits for the three months following the fire as $97,652[8]
and its extra expenses as $4,282.80, for a total of $101,934.80.  This number does not take into account
seasonal sales and is based upon AHC using cleaned
smoke-damaged hats as inventory.  When
asked if it would be fraudulent for AHC to sell
smoke-damaged hats as new, McBay responded, AAt
least, foolish; and probably fraudulent, yes, sir.@

In a
letter sent to Wise=s counsel, McBay opined on the costs paid by Travelers as a result of
the damage to AHC. 
Specifically, he wrote:

The building repair costs, clean up expenses,
temporary storage costs, contents losses, business interruption loss and extra
expenses incurred by [AHC] were determined in the
approximate amount of $9,437,592.72.  It
is my understanding that [AHC=s] damages in the
amount of $6,792,604.98 were not insured.

 

I have calculated that [Travelers] paid [AHC] and American Hat vendors $2,644,987.74 as a result of
the damage. . . .

 

6. 
Deposition Testimony of Frances Scott Dau

 

 








Frances
Scott Dau was hired to determine (1) the amount of
smoke damage to AHC=s
building and inventory and (2) AHC=s
lost profits after the fire.[9]  After visiting AHC=s
plant, Dau prepared the following statement of loss:

BUILDING DAMAGES

Structural Building Cleaning                                   $  81,266.09

 

CONTENT DAMAGES

Storage Rental, Unpack, Inventory, Repack            $  61,653.54

Replace Damaged Stage 1 AFelts@                          $  56,951.00

Replace Damaged Stage 2 AFelts@                          $  32,481.00

Replace Damaged Stage 3 AFelts@                          $  22,632.00

Replace Damaged Stage 1 AStraws@                       $   2,583.00

Replace Damaged Stage 2 AStraws@                       $  20,999.00

Replace Damaged Stage 3 AStraws@                       $  23,370.00

Cleaning of 477,080 hats                         $ 355,663.14

Total:                                                                     $
576,332.68

 

BUSINESS INCOME

Lost Profits & Extra Expenses                                $101,934.80[10]

 

Dau
used figures given to him by AHC for replacement
costs to calculate content damages.  Dau=s estimate of $576,332.68
for AHC=s
content damages assumes that all but 13,012 of the 490,092 damaged hats could
be cleaned.  When asked if the hats would
be marketable after being cleaned, Dau responded, AI
would not know.@  Dau conceded that
if the hats were not marketable after being cleaned then it would change his
estimate for AHC=s
content damages.

7.  Testimony of John Michael Corn, Forensic
Chemist

John
Michael Corn analyzes samples from fire scenes to determine if an accelerant is
present.  He analyzed hats from AHC=s inventory to determine if
there was any soot residue or odor from soot on the hats, but the hats Corn
analyzed did not come directly from AHC.[11]  Corn analyzed fourteen hats, each classified
as a sample and representing approximately 35,000 hats.  When asked if the sampling was a true sample,
Corn responded, AIt=s a
true sample in that if they were taken from those trailers, they are a true
sample.  Now, is it a representative
sample, I can=t
answer that.@  Of the fourteen hats sampled, Corn found two
that had Aparticulates
with the morphology of soot on them.@  He also found dust, dirt, and common
environmental mold on some of the hats he inspected.

Corn
testified that

[t]he
hats can be easily cleaned by brushing with an appropriate material and
vacuuming with a HEPA filter or remote vacuum.  Hats with discernible odor can be treated by
placing the hats in a chamber that can be purged with heated filtered air.  The smoke odor is a mixture of high molecular
weight alcohols and aldehydes and these compounds can
be vaporized by heat and moving air. 

 

 








When asked whether the two
hats on which he found particulants had been cleaned
before the testing, Corn responded, AThey
were reported to have been cleaned by vacuuming, steaming, and brushing, yes.@  Corn further recommended putting the hats in
a chamber to get rid of the smell but conceded that he had not tried cleaning
any of the hats in this way.  Corn opined
that it would not be wrong to sell a hat as new after being cleaned.

8.  Deposition Testimony of Jeff Biggars, AHC=s
Plant Manager

Jeff
Biggars testified that on an average day, AHC produced 300 to 360 straw hats and 84 to 120 felt
hats.  Biggars
stated that it takes between six months to a year to receive straw bodies from
China.  He also opined that the hats,
which were stored in containers in the parking lot, could not be cleaned.

D.  AHC=s
Closing Argument

In
its closing argument, AHC argued and reiterated in
pertinent part that: 

1)       It had 490,092 hats in its inventory at
the time of the fire;

 

2)       The hats could not be cleaned and were
not sellable;

 

3)       Startz
estimated a replacement value of $13,385,969.37; 

 

4)       Dr. Shipp calculated AHC=s past and future
lost profits in the amount of $5,774,923;

 

5)       It had previously been determined in the
companion case involving Travelers that AHC had a
total loss of $9,437,592.72, which included: 
building repair costs, clean up expenses, temporary storage costs,
contents losses, business interruption loss, and extra expenses; and

 

6)       Travelers paid AHC
$2.6 million.

 

E.  Wise=s Closing Argument

 

In its closing arguments, Wise argued and
reiterated in pertinent part that:

 

1)       AHC=s estimated value of
its inventory was a moving target;

 

2)       In 2003, Maddox purchased AHC=s inventory and
equipment for $350,000;

 

3)       AHC=s 2005 tax appraisal
listed the market value of AHC=s inventory and
equipment at $200,000;

 

4)       AHC=s 2006 tax appraisal
listed the market value of AHC=s inventory and
equipment at $105,000;

 

5)       Travelers paid AHC
$2 million for its inventory; 

 

6)       There is a good argument that the money AHC received from its insurance fully compensated AHC for its property loss;

 

7)       Dau calculated
content damages in the amount of  $576,332.68; and

 

8)       Dau reported AHC had lost profits in the amount of $101,934.80.

 

F.  Jury Charge

 

The
trial court submitted the following jury charge without objection from AHC:

AMarket value@ means the amount
that would be paid in cash by a willing buyer who desires to buy, but is not
required to buy, to a willing seller who desires to sell, but is under no
necessity of selling.

 

 








ALost profits@ are the damages for
the loss of net income to a business.  ALost
profits@ means the difference
between a business=s total receipts and
all of the expenses incurred in carrying on the business. Lost profits need not
be proven by a precise calculation, but must be proven by reasonable
certainty.  Lost profits are not
recoverable if they are dependent upon uncertain or changing market conditions,
chancy business opportunities, promotion of untested products or entry into
unknown or unviable markets, or on the success of a new and unproven
enterprise.

 

Answer,
with respect to the elements listed, in dollars and cents for damages, if any,
for:

 

a.  The difference, if any,
in the market value in Montague County, Texas, of [AHC=s] inventory
immediately before and immediately after the occurrence in question.

 

Answer:                     

 

.
. . 

 

c. 
Lost
profits sustained in the past.

 

Answer:                      

 

d. 
Lost
profits that, in reasonable probability, will be sustained in the future.

 

Answer:                          

G.  Jury=s
Verdict

The
jury found that Wise was negligent and awarded AHC
$95,000 for the decrease in market value of its inventory, $270,000 for its
past lost profits, and $0 for future lost profits.

H.  Post-trial

Wise
filed a motion for entry of judgment asserting that, under the Aone
satisfaction@
rule, the trial court should render a take-nothing judgment because AHC had been made whole by the $2.6 million payment from
Travelers.  Alternatively, Wise argued
that it was entitled to a credit under chapter 33 of the civil practice and
remedies code for the $1.9 million settlement payment it made to Travelers in
exchange for a release of Travelers=s claim
against Wise.

AHC
filed a motion to disregard the jury=s
answers and a motion for judgment on the verdict, arguing that (1) Wise was
collaterally estopped from requesting a damage award
inconsistent with the trial court=s
judgment in the companion case, which awarded AHC
damages in the amount of $8,729,529, and (2) the jury=s
award of damagesC$95,000 for AHC=s loss of inventory,
$270,000 for past lost profits, and $0 for future lost profitsCwas
against the great weight and preponderance of the evidence.

The
trial court entered a final judgment awarding AHC
damages in accordance with the jury=s
findings.  Wise filed a motion to modify
the judgment or for judgment notwithstanding the verdict, reasserting its
entitlement to a take-nothing judgment by virtue of either the settlement
payment to Travelers or the assignment of Travelers=s
subrogation right.  AHC
filed a motion for new trial.  The
motions were overruled by operation of law. 
This appeal and cross-appeal followed.

III.  Judicial Notice and Collateral Estoppel

In
its first issue, AHC asserts that (1) the trial court
erred by not taking judicial notice of its judgment in the AHC-Travelers
companion case and (2) Wise is collaterally estopped
from contesting the damage award in the companion case.

Although
AHC presents its first issue as a judicial notice
challenge and as an issue of collateral estoppel, AHC=s briefing focuses solely on
the issue of collateral estoppel.  Therefore, we do not address AHC=s judicial notice
challenge.  See Tex. R. App. P.
38.1(i); Fredonia State Bank v. Gen. Am. Life Ins.
Co., 881 S.W.2d 279, 284B85
(Tex. 1994).  We do note, however, that
even if the trial court had taken judicial notice of its prior judgment, the
use to which that judgment may have been put is circumscribed by the doctrine
of collateral estoppel.  See Tex. Real Estate Comm=n v.
Nagle, 767 S.W.2d 691, 694 (Tex.
1989) (AA
court may take judicial notice of its own records and judgments, but the use to
which such records may be put is circumscribed by the doctrines of res judicata and collateral estoppel.@).

Collateral
estoppel can be applied offensively or
defensively.  Case Funding Network,
L.P. v. Anglo‑Dutch Petroleum Int'l, Inc.,
264 S.W.3d 38, 57 (Tex. App.CHouston
[1st Dist.] 2007, pet. denied).  A
plaintiff uses offensive collateral estoppel when it
seeks to estop a defendant from relitigating
an issue that the defendant previously litigated and lost in a suit involving
another party.  Id.  A trial court has broad discretion in
determining whether to allow a plaintiff to use collateral estoppel
offensively. See Parklane Hosiery Co. v. Shore,
439 U.S. 322, 331, 99 S. Ct. 645, 651 (1979); see also Scurlock
Oil Co. v. Smithwick, 724 S.W.2d
1, 7 (Tex. 1986) (citing Parklane Hosiery with
approval).  A trial court abuses its
discretion only when its action is arbitrary and unreasonable, without
reference to guiding rules or principles.  Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 (Tex.
1991).

As a
preliminary matter, we agree with Wise that AHC
failed to plead collateral estoppel in its
petition.  However, even assuming the
issue of collateral estoppel was tried by consent, AHC failed to present sufficient evidence to establish that
collateral estoppel applied.  See Scurlock Oil
Co. v. Smithwick, 787 S.W.2d
560, 562 (Tex. App.CCorpus
Christi 1990, no writ) (AThe burden is on appellants
to present sufficient evidence to establish that the doctrine of collateral estoppel should apply.@).

To
establish collateral estoppel, AHC
had to show:  (1) the facts pertaining to
damages in this case were fully and fairly litigated in the AHC-Travelers
case, (2) the facts pertaining to damages in this case were essential to the
judgment in the AHC-Travelers case, and (3) that AHC and Wise were cast as adversaries in the first
case.  See Tex. Dep=t of
Pub. Safety v. Petta, 44 S.W.3d 575, 579 (Tex.
2001).

Here,
neither the judgment nor the pleadings from the companion case are part of the
record.  Consequently, it is unclear from
the record whether the facts pertaining to damages in this case were fully and
fairly litigated in the AHC-Travelers case.  See Jones v. City of Houston,
907 S.W.2d 871, 874 (Tex. App.CHouston
[1st Dist.] 1995, writ denied) (holding party relying on the doctrine of
collateral estoppel is required to introduce into
evidence both the judgment and pleadings from the prior suit); see also
Cuellar v. City of San Antonio, 821 S.W.2d 250,
256 (Tex. App.CSan
Antonio 1991, writ denied) (same).  Thus,
the trial court did not abuse its discretion by refusing to give collateral estoppel effect to the damages awarded in the AHC-Travelers case. 
Accordingly, we overrule AHC=s
first issue.

IV.  Damages

In
its third issue, AHC asserts that the jury=s
finding as to the difference in the market value of AHC=s
inventory immediately before and immediately after the fire was against the
great weight and preponderance of the evidence. We agree.

A.  Standard of Review

When
a party attacks the factual sufficiency of an adverse finding on an issue on
which it had the burden of proof, it must demonstrate on appeal that the
adverse finding is against the great weight and preponderance of the evidence.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 242 (Tex. 2001).  We consider all the evidence and set aside
the judgment only if it is so contrary to the overwhelming weight of the
evidence that it is clearly wrong and unjust. 
Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986).

B.  Market Value

Market
value is the primary method of valuation in cases involving damage to personal
property.  See Int=l‑Great N. R.R. Co. v. Casey, 46
S.W.2d 669, 670 (Tex. Comm=n
App. 1932, holding approved).  Market
value is defined as the price property would bring when it is offered for sale
by one who desires to sell, but is not bound to do so, and is bought by one
under no necessity to purchase it.   Exxon Corp. v. Middleton, 613 S.W.2d 240, 246 (Tex. 1981); Ford Motor Co. v. Cooper,
125 S.W.3d 794, 799 (Tex. App.CTexarkana
2004, no pet.).  The market value of
property is determined at the place where the damage occurred.  See Thomas v. Oldham, 895 S.W.2d 352, 359 (Tex.
1995).  If the property has a market
value, a plaintiff=s damages are measurable as
the difference in market value immediately before and after the injury.  Id. 

C.  Analysis  


At
trial, Maddox testified that 490,092 hats, over $13 million in inventory, had
been damaged by the fire and could not be sold. 
Startz, AHC=s
expert, testified that the replacement cost for AHC=s
inventory was $13,385,969.37.  Based on
the evidence presented by AHC at trial, AHC sought the replacement cost of its inventory and not
the market value.  See Shaw Tank
Cleaning Co. v. Tex. Pipeline Co., 442 S.W.2d
851, 854 (Tex. Civ. App.CAmarillo
1969, writ ref=d n.r.e.) (holding that if the property has no market value
and can be replaced, replacement costs are the proper measure of damages); see
also Moran Corp. v. Murray, 381 S.W.2d 324, 328
(Tex. Civ. App.CTexarkana 1964, no writ)
(stating that it is the plaintiff=s
burden to show which method of valuation other than market value is
appropriate).  This conclusion is further
supported by AHC=s
request for lost profits, which are not recoverable if market value is
awarded.  See State v. Whataburger,
Inc., 60 S.W.3d 256, 262 (Tex. App.CHouston [14th Dist.] 2001,
pet. denied) (stating that any award for lost profits and the difference in
market value constitutes a double recovery).

However,
the trial court submitted, without objection by AHC,
a jury charge on market value and not replacement cost.  Thus, we must determine whether the evidence
was sufficient to support the jury=s
award for market value.  See Wal‑Mart Stores, Inc. v. Sturges,
52 S.W.3d 711, 715 (Tex. 2001) (stating that an
assessment of the evidence Amust
be made in light of the jury charge that the district court gave without
objection@); see
also City of Fort Worth v. Zimlich, 29 S.W.3d 62, 71 (Tex. 2000) (ASince
neither party objected to this instruction [regarding malice], we are bound to
review the evidence in light of this definition.@).

For
the jury to have calculated AHC=s
damages based on market value, there had to be evidence of the value of AHC=s inventory immediately
before and immediately after the fire.  See
Thomas, 895 S.W.2d at 359.  As both Wise and AHC
point out, and we agree, the jury=s
$95,000 figure is apparently the difference between the inventory figures
submitted for tax appraisal purposes in 2005 and those submitted in 2006 (that
is, $200,000 and $105,000).  The only
other calculation resulting in a damage figure in any way similar to this again
uses the 2005 tax figure ($200,000) and subtracts AHC=s
2005 cost of goods sold ($106,016) found in Shipp=s
lost profits calculations, to yield a figure of $93,984.  Either way, the jury=s
calculations require the use of AHC=s
2005 inventory appraisal figure. 

The
inventory appraisal figure calculated sometime before January 1, 2005, and
submitted to the taxing authorities for the January 1, 2005 date is certainly
not immediately before the occurrence in question, which took place on November
27, 2005, approximately eleven months later. 
Nor is there evidence linking the 2005 appraisal figure to the value of AHC=s inventory immediately
before the fire.  That is, there is no
evidence that the value of AHC=s
inventory immediately before the fire was the same as the 2005 appraisal figure
eleven months earlier.

The
jury, however, heard Maddox testify that the value of AHC=s
inventory immediately before the fire was over $13 million.  Although the evidence suggests that Maddox
was referring to replacement costs and not market value, it is reasonable to
infer that the market value of AHC=s
inventory would not be less than the cost to replace the inventory.  The jury also heard that the umpire in the
companion case determined that the value of AHC=s
inventory loss was $8,792,529.  Even Dau, Wise=s
own expert, testified that AHC had market value
damages in the amount of $355,663.14 and replacement costs of over
$150,000.  Finally, it was undisputed
that AHC had 490,092 hats in its inventory at the
time of the fire.  Using the 2005 tax
figure to calculate market value would result in a market value of
approximately $0.41 per hat ($200,000/490,092). 
That amount is far less than the replacement cost per hat, which, based
on the evidence presented at trial, ranges from $5.43 to $137.11 per hat.  Thus, based on the record as a whole, we hold
that the jury=s
finding as to market value is so contrary to the overwhelming weight of the
evidence that it is clearly wrong and unjust. 
Accordingly, we sustain AHC=s
third issue.[12]

V. 
Conclusion

Our
resolution here does not expressly affect the liability portion of the trial
court=s
judgment.  However, under current Texas
law, we are nevertheless required to remand this proceeding for a new trial on
both liability and damages. That is, when liability is contested, as here,[13]
we are not permitted to remand for a separate trial solely on unliquidated damages. 
See Tex. R. App. P. 44.1(b) (prohibiting a separate trial solely
on unliquidated damages when liability is contested);
see also Estrada v. Dillon, 44 S.W.3d 558, 562
(Tex. 2001) (stating party=s
failure to present on appeal an additional discrete challenge to liability when
party challenges damages does not defeat plain language of rule 44.1(b)).  Accordingly, we reverse the trial court=s
judgment and remand for a new trial.

 

BOB MCCOY

JUSTICE

 

 

PANEL:  WALKER and MCCOY, JJ.; and WILLIAM BRIGHAM
(Senior Justice, Retired, Sitting by Assignment).

 

DELIVERED:
October 14, 2010











[1]See Tex. R. App. P.
47.4.





[2]Maddox stated that,
based on his experience, it would be impossible to get the smoke smell out of a
hat by cleaning it.  And because it costs
$75 to clean a hat, cleaning the hats would not be cost efficient.  He added that it would be fraudulent to sell
a smoke-damaged hat as new.





[3]Of AHC=s damaged inventory,
about $1.2 million had been designated to ship to Cavender=sCone of the customers AHC lost.





[4]The record does not
identify who hired Moore, but it was a group with interests adverse to Maddox
and AHC.  After
Moore formed his opinion, AHC hired him to give that
opinion at trial.





[5]Dr. Shipp, also a
professor at the Neeley School of Business at Texas
Christian University, is a Certified Earnings Analyst who has been determining
lost profits since 1994.





[6]Dr. Shipp=s original report
showed a lost profit calculation of $3.6 million.  Dr. Shipp updated his calculations after
receiving an inventory valuation change and new information about increased
costs.  Dr. Shipp=s total lost profits
are based on the following calculations:

 




 
 
  
 Year
 
 
  
 Lost Profits
 
 
 
 
  
 2005
 
 
  
 $    807,459
 
 
 
 
  
 2006
 
 
  
 $ 1,124,292
 
 
 
 
  
 2007
 
 
  
 $ 1,063,617
 
 
 
 
  
 2008
 
 
  
 $ 1,021,848
 
 
 
 
  
 2009
 
 
  
 $    805,148
 
 
 
 
  
 2010
 
 
  
 $    574,229
 
 
 
 
  
 2011
 
 
  
 $    378,330
 
 




 





[7]McBay is also a Certified
Fraud Examiner, Certified Valuation Analyst, Certified Forensic Financial
Analyst, and a Certified Fraud Deterrence Analyst.





[8]$184,172 (business
interruption loss) 

-$  15,269 (actual sales)

-$  66,043 (cost of sales)

-$    5,208 (noncontinuing
expenses)

           $ 
97,652 (lost profits)





[9]It is unclear who
originally hired Dau; however, Dau
testified on behalf of Wise.





[10]Dau hired McBay to calculate AHC=s lost profits.





[11]It is unclear who
hired Corn; however, Corn testified that he received the hats from Blackmon
Mooring and Serv Pro.





[12]Because AHC=s third issue is
dispositive, we do not address AHC=s second issue, nor
do we reach Wise=s cross-issues.  See Tex. R. App. P. 47.1.





[13]Wise contested its
liability by challenging whether it acted negligently, asserting that the fire
was the result of an Act of God, an unavoidable accident, condition, or
situation as defined by Texas law.