

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00368-CV

| | |
|---|---|
| AMERICAN HAT COMPANY | APPELLANT AND APPELLEE |

V.

| | |
|---|---|
| WISE ELECTRIC COOPERATIVE, INC. | APPELLEE AND APPELLANT |

------------

FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In three issues, Appellant/Cross-Appellee American Hat Company (AHC) asserts that 1) the trial court erred by not taking judicial notice of its judgment in a companion case, 2) the trial court erred by admitting AHC's tax records, and 3) the jury finding pertaining to market value was against the great weight and preponderance of the evidence. Because we reverse and remand for a new trial, we

---

[1] ... *See* Tex. R. App. P. 47.4.

do not reach Cross-Appellant/Appellee Wise Electric Cooperative, Inc.'s (Wise's) issues. *See* Tex. R. App. P. 47.1.

## II. Factual and Procedural History

On November 27, 2005, a wildfire occurred in and around Bowie, burning 900 to 1,200 acres. Bowie's fire chief, Doug Page, determined that the fire began at a utility pole owned by Wise, caused by a "conductor [that] had come loose from a splice and contacted the ground rod[,]" and resulting in molten material falling onto grass near the pole.

### A. AHC and Travelers's Companion Case

In 2006, AHC, which owns a manufacturing plant in Bowie, submitted a claim to its insurance company, The Travelers Lloyds Insurance Company (Travelers), asserting that smoke and soot from the 2005 wildfire resulted in inventory loss, building damage, and lost profits. The trial court appointed an umpire pursuant to an "appraisal" provision in AHC's insurance contract to determine the value of the loss. The umpire awarded AHC $8,792,529 for inventory loss, $312,145.72 for building damages, and $332,921 for lost profits. The trial court, finding no objections to the umpire's award, found that the award was final and binding. Travelers ultimately paid AHC approximately $2.6 million, including $2 million for inventory (policy limits).

### B. AHC and Wise (Pretrial)

2

One year later, AHC filed suit against Wise for negligence, alleging that the damage to its building and contents, including inventory, was "at least $10 [million]." Travelers intervened, asserting its subrogation rights to the first $2.6 million of any recovery obtained by AHC.

Before trial, Wise reached a mediated settlement agreement with Travelers, in which Travelers, for $1.9 million, agreed to release its claim against Wise and to assign to Wise "its entire priority claim interest in the amount of [$2.6 million] from any recovery by [AHC]."

Also prior to trial, AHC filed a motion asking the trial court to take judicial notice of its order ratifying the $8,792,529 appraisal award in the companion case. After a hearing on the matter, the trial court denied AHC's motion.

## C. Evidence at Trial

In addition to evidence of liability, the jury also received the following evidence pertaining to damages.

### 1. Testimony of Keith Maddox, AHC's Owner

Keith Maddox purchased AHC out of foreclosure in 2003, paying $350,000 for AHC's inventory and equipment. Around a year later, he moved AHC's manufacturing plant from Conroe to Bowie. On the day of the fire in November 2005, AHC had 490,092 hats in its inventory, totaling $2 million worth of inventory inside the plant and $11 million worth of inventory in sealed containers in the parking

3

lot. All 490,092 hats had smoke damage as a result of the fire and were not sellable.[2]

The damaged hats were either felt or straw and were in one of three stages—stage one, "raw bodies"; stage two, finished hats that needed the name and sweatband added to the inside; and stage three, finished hats ready to be shipped. Because it takes anywhere from six months to a year to obtain raw bodies from overseas, AHC lost customers after the fire due to a lack of inventory.[3]

The Montague County tax appraisal records listed AHC's inventory and equipment at $200,000 as of January 1, 2005, and at $105,000 as of January 1, 2006. When questioned about Montague County's tax appraisal requirement that local businesses report the actual value for new inventory and the market value for old inventory, Maddox conceded that AHC reported a value of $200,000 for its inventory and equipment in January 2005 and that he could not recall AHC ever reporting a value of a million dollars or more for its inventory.

## 2. Testimony of Gary Moore, Retired Hatco Employee

Gary Moore, a retired employee of one of AHC's competitors with over twenty-six years of experience in the hat industry, had been hired to inspect the damaged

---

[2] ... Maddox stated that, based on his experience, it would be impossible to get the smoke smell out of a hat by cleaning it. And because it costs $75 to clean a hat, cleaning the hats would not be cost efficient. He added that it would be fraudulent to sell a smoke-damaged hat as new.

[3] ... Of AHC's damaged inventory, about $1.2 million had been designated to ship to Cavender's—one of the customers AHC lost.

hats and to give his opinion on them.[4] He opined that all of AHC's hats were smoke-damaged, water-damaged, or both. Based on his experience, a hat with smoke damage could not be cleaned, and, even if the hats could be cleaned, they could not be sold as new.

### 3. Testimony of Steve Startz, Owner of Startz Insurance Salvage

AHC hired Steve Startz to determine the replacement cost of AHC's inventory immediately before the fire. Startz determined the actual cost of producing each hat at the various stages of production from AHC's 2005 invoices, profit and loss statements, and tax records.

In 2005, AHC calculated an inventory loss of $8.7 million. Three years later, AHC submitted a new calculation, showing an inventory loss of approximately $10 million. Startz later found errors in the previous calculations and submitted a new amount of $13,385,969.37.

At trial, Startz testified that based upon his education, experience, and investigation, he concluded that the total replacement cost would be $13,385,969.37, based on the following calculations:

| Hat Type | Number of Hats | Cost per Hat | Replacement Cost |
|---|---|---|---|
| Stage 1 Felt | 38,670 | $ 40.25 | $1,556,467.50 |

---

[4] The record does not identify who hired Moore, but it was a group with interests adverse to Maddox and AHC. After Moore formed his opinion, AHC hired him to give that opinion at trial.

5

| | | | |
|---|---|---|---|
| Stage 2 Felt | 63,381 | $123.58 | $7,832,623.98 |
| Stage 3 Felt | 4,574 | $137.11 | $ 627,141.14 |
| Stage 1 Straw | 345,870 | $ 5.43 | $1,878,074.10 |
| Stage 2 Straw | 23,701 | $ 39.25 | $ 930,264.25 |
| Stage 3 Straw | 13,896 | $ 40.04 | $ 561,398.40 |

### 4. Testimony of Shannon Henry Shipp, Ph.D.

AHC hired Shannon Henry Shipp, Ph.D., a partner of a firm that provides economic analysis and calculations for litigation support, to calculate AHC's lost profits.[5] Although he did not have any prior experience with the hat manufacturing process, Dr. Shipp calculated $5,774,923 as total lost profits for AHC from 2005 to 2011.[6]

---

[5] Dr. Shipp, also a professor at the Neeley School of Business at Texas Christian University, is a Certified Earnings Analyst who has been determining lost profits since 1994.

[6] Dr. Shipp's original report showed a lost profit calculation of $3.6 million. Dr. Shipp updated his calculations after receiving an inventory valuation change and new information about increased costs. Dr. Shipp's total lost profits are based on the following calculations:

| Year | Lost Profits |
|---|---|
| 2005 | $ 807,459 |
| 2006 | $ 1,124,292 |
| 2007 | $ 1,063,617 |
| 2008 | $ 1,021,848 |
| 2009 | $ 805,148 |

To calculate AHC's lost profits, Dr. Shipp "had several conversations with Mr. Maddox over time, also met with several folks at his company, and . . . talked about everything from how many people there were and how they—how those folks were organized, production people, financial people, office people."  Most of the background information he used to calculate AHC's lost profits came from Maddox and Startz.  Dr. Shipp testified that he considered seasonal sales as well as the different types of entities AHC sold to—stand alone stores, chain stores, and individuals.  He based future projections on past sales, testifying that these "projections and forecasts have a margin of error [and] . . . hitting something exactly on the number, probably that's not going to happen; within a range, probably."

Dr. Shipp testified that AHC had problems filling its orders prior to the fire. "According to Mr. Maddox, Cavend[e]r's had purchased large orders for several locations, several Cavend[e]r's locations, in the months before [AHC] moved to Bowie, Texas.  When the factory was closed for the remodel and training the workforce, AHC was unable to meet all the delivery deadlines."

### 5.  Testimony of Dennis McBay, CPA[7]

| 2010 | $  574,229 |
|------|------------|
| 2011 | $  378,330 |

[7]... McBay is also a Certified Fraud Examiner, Certified Valuation Analyst, Certified Forensic Financial Analyst, and a Certified Fraud Deterrence Analyst.

Wise hired Dennis McBay to evaluate AHC's lost profits and extra expense loss. McBay reviewed historical sales, sales orders, historical financial statements, and shipping information. He calculated AHC's lost profits for the three months following the fire as $97,652[8] and its extra expenses as $4,282.80, for a total of $101,934.80. This number does not take into account seasonal sales and is based upon AHC using cleaned smoke-damaged hats as inventory. When asked if it would be fraudulent for AHC to sell smoke-damaged hats as new, McBay responded, "At least, foolish; and probably fraudulent, yes, sir."

In a letter sent to Wise's counsel, McBay opined on the costs paid by Travelers as a result of the damage to AHC. Specifically, he wrote:

> The building repair costs, clean up expenses, temporary storage costs, contents losses, business interruption loss and extra expenses incurred by [AHC] were determined in the approximate amount of $9,437,592.72. It is my understanding that [AHC's] damages in the amount of $6,792,604.98 were not insured.
>
> I have calculated that [Travelers] paid [AHC] and American Hat vendors $2,644,987.74 as a result of the damage. . . .

**6. Deposition Testimony of Frances Scott Dau**

---

[8] ... $184,172 (business interruption loss)
-$ 15,269 (actual sales)
-$ 66,043 (cost of sales)
-$   5,208 (noncontinuing expenses)
 $ 97,652 (lost profits)

Frances Scott Dau was hired to determine (1) the amount of smoke damage to AHC's building and inventory and (2) AHC's lost profits after the fire.[9] After visiting AHC's plant, Dau prepared the following statement of loss:

**BUILDING DAMAGES**

| | |
|---|---|
| Structural Building Cleaning | $ 81,266.09 |

**CONTENT DAMAGES**

| | |
|---|---|
| Storage Rental, Unpack, Inventory, Repack | $ 61,653.54 |
| Replace Damaged Stage 1 "Felts" | $ 56,951.00 |
| Replace Damaged Stage 2 "Felts" | $ 32,481.00 |
| Replace Damaged Stage 3 "Felts" | $ 22,632.00 |
| Replace Damaged Stage 1 "Straws" | $  2,583.00 |
| Replace Damaged Stage 2 "Straws" | $ 20,999.00 |
| Replace Damaged Stage 3 "Straws" | $ 23,370.00 |
| Cleaning of 477,080 hats | $355,663.14 |
| Total: | $576,332.68 |

**BUSINESS INCOME**

| | |
|---|---|
| Lost Profits & Extra Expenses | $101,934.80[10] |

Dau used figures given to him by AHC for replacement costs to calculate content damages. Dau's estimate of $576,332.68 for AHC's content damages assumes that all but 13,012 of the 490,092 damaged hats could be cleaned. When asked if the hats would be marketable after being cleaned, Dau responded, "I would not know." Dau conceded that if the hats were not marketable after being cleaned then it would change his estimate for AHC's content damages.

### 7. Testimony of John Michael Corn, Forensic Chemist

---

[9] ... It is unclear who originally hired Dau; however, Dau testified on behalf of Wise.

[10] ... Dau hired McBay to calculate AHC's lost profits.

John Michael Corn analyzes samples from fire scenes to determine if an accelerant is present. He analyzed hats from AHC's inventory to determine if there was any soot residue or odor from soot on the hats, but the hats Corn analyzed did not come directly from AHC.[11] Corn analyzed fourteen hats, each classified as a sample and representing approximately 35,000 hats. When asked if the sampling was a true sample, Corn responded, "It's a true sample in that if they were taken from those trailers, they are a true sample. Now, is it a representative sample, I can't answer that." Of the fourteen hats sampled, Corn found two that had "particulates with the morphology of soot on them." He also found dust, dirt, and common environmental mold on some of the hats he inspected.

Corn testified that

[t]he hats can be easily cleaned by brushing with an appropriate material and vacuuming with a HEPA filter or remote vacuum. Hats with discernible odor can be treated by placing the hats in a chamber that can be purged with heated filtered air. The smoke odor is a mixture of high molecular weight alcohols and aldehydes and these compounds can be vaporized by heat and moving air.

When asked whether the two hats on which he found particulants had been cleaned before the testing, Corn responded, "They were reported to have been cleaned by vacuuming, steaming, and brushing, yes." Corn further recommended putting the hats in a chamber to get rid of the smell but conceded that he had not tried cleaning

---

[11] ... It is unclear who hired Corn; however, Corn testified that he received the hats from Blackmon Mooring and Serv Pro.

any of the hats in this way.  Corn opined that it would not be wrong to sell a hat as new after being cleaned.

### 8.  Deposition Testimony of Jeff Biggars, AHC's Plant Manager

Jeff Biggars testified that on an average day, AHC produced 300 to 360 straw hats and 84 to 120 felt hats.  Biggars stated that it takes between six months to a year to receive straw bodies from China.  He also opined that the hats, which were stored in containers in the parking lot, could not be cleaned.

## D.  AHC's Closing Argument

In its closing argument, AHC argued and reiterated in pertinent part that:

1)  It had 490,092 hats in its inventory at the time of the fire;

2)  The hats could not be cleaned and were not sellable;

3)  Startz estimated a replacement value of $13,385,969.37;

4)  Dr. Shipp calculated AHC's past and future lost profits in the amount of $5,774,923;

5)  It had previously been determined in the companion case involving Travelers that AHC had a total loss of $9,437,592.72, which included:  building repair costs, clean up expenses, temporary storage costs, contents losses, business interruption loss, and extra expenses; and

6)  Travelers paid AHC $2.6 million.

## E.  Wise's Closing Argument

In its closing arguments, Wise argued and reiterated in pertinent part that:

11

1)     AHC's estimated value of its inventory was a moving target;

2)     In 2003, Maddox purchased AHC's inventory and equipment for $350,000;

3)     AHC's 2005 tax appraisal listed the market value of AHC's inventory and equipment at $200,000;

4)     AHC's 2006 tax appraisal listed the market value of AHC's inventory and equipment at $105,000;

5)     Travelers paid AHC $2 million for its inventory;

6)     There is a good argument that the money AHC received from its insurance fully compensated AHC for its property loss;

7)     Dau calculated content damages in the amount of $576,332.68; and

8)     Dau reported AHC had lost profits in the amount of $101,934.80.

## F. Jury Charge

The trial court submitted the following jury charge without objection from AHC:

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

"Lost profits" are the damages for the loss of net income to a business. "Lost profits" means the difference between a business's total receipts and all of the expenses incurred in carrying on the business. Lost profits need not be proven by a precise calculation, but must be proven by reasonable certainty. Lost profits are not recoverable if they are dependent upon uncertain or changing market conditions, chancy business opportunities, promotion of untested products or entry into unknown or unviable

12

markets, or on the success of a new and unproven enterprise.

Answer, with respect to the elements listed, in dollars and cents for damages, if any, for:

a. The difference, if any, in the market value in Montague County, Texas, of [AHC's] inventory immediately before and immediately after the occurrence in question.

Answer:_____

. . .

c. Lost profits sustained in the past.

Answer:_____

d. Lost profits that, in reasonable probability, will be sustained in the future.

Answer:_____

## G. Jury's Verdict

The jury found that Wise was negligent and awarded AHC $95,000 for the decrease in market value of its inventory, $270,000 for its past lost profits, and $0 for future lost profits.

## H. Post-trial

Wise filed a motion for entry of judgment asserting that, under the "one satisfaction" rule, the trial court should render a take-nothing judgment because AHC had been made whole by the $2.6 million payment from Travelers. Alternatively, Wise argued that it was entitled to a credit under chapter 33 of the civil practice and

13

remedies code for the $1.9 million settlement payment it made to Travelers in exchange for a release of Travelers's claim against Wise.

AHC filed a motion to disregard the jury's answers and a motion for judgment on the verdict, arguing that (1) Wise was collaterally estopped from requesting a damage award inconsistent with the trial court's judgment in the companion case, which awarded AHC damages in the amount of $8,729,529, and (2) the jury's award of damages—$95,000 for AHC's loss of inventory, $270,000 for past lost profits, and $0 for future lost profits—was against the great weight and preponderance of the evidence.

The trial court entered a final judgment awarding AHC damages in accordance with the jury's findings. Wise filed a motion to modify the judgment or for judgment notwithstanding the verdict, reasserting its entitlement to a take-nothing judgment by virtue of either the settlement payment to Travelers or the assignment of Travelers's subrogation right. AHC filed a motion for new trial. The motions were overruled by operation of law. This appeal and cross-appeal followed.

### III. Judicial Notice and Collateral Estoppel

In its first issue, AHC asserts that (1) the trial court erred by not taking judicial notice of its judgment in the AHC-Travelers companion case and (2) Wise is collaterally estopped from contesting the damage award in the companion case.

Although AHC presents its first issue as a judicial notice challenge and as an issue of collateral estoppel, AHC's briefing focuses solely on the issue of collateral

14

estoppel. Therefore, we do not address AHC's judicial notice challenge. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994). We do note, however, that even if the trial court had taken judicial notice of its prior judgment, the use to which that judgment may have been put is circumscribed by the doctrine of collateral estoppel. *See Tex. Real Estate Comm'n v. Nagle*, 767 S.W.2d 691, 694 (Tex. 1989) ("A court may take judicial notice of its own records and judgments, but the use to which such records may be put is circumscribed by the doctrines of res judicata and collateral estoppel.").

Collateral estoppel can be applied offensively or defensively. *Case Funding Network, L.P. v. Anglo-Dutch Petroleum Int'l, Inc.*, 264 S.W.3d 38, 57 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). A plaintiff uses offensive collateral estoppel when it seeks to estop a defendant from relitigating an issue that the defendant previously litigated and lost in a suit involving another party. *Id.* A trial court has broad discretion in determining whether to allow a plaintiff to use collateral estoppel offensively. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331, 99 S. Ct. 645, 651 (1979); *see also Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 7 (Tex. 1986) (citing *Parklane Hosiery* with approval). A trial court abuses its discretion only when its action is arbitrary and unreasonable, without reference to guiding rules or principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

As a preliminary matter, we agree with Wise that AHC failed to plead collateral estoppel in its petition. However, even assuming the issue of collateral estoppel was

15

tried by consent, AHC failed to present sufficient evidence to establish that collateral estoppel applied. *See Scurlock Oil Co. v. Smithwick*, 787 S.W.2d 560, 562 (Tex. App.—Corpus Christi 1990, no writ) ("The burden is on appellants to present sufficient evidence to establish that the doctrine of collateral estoppel should apply.").

To establish collateral estoppel, AHC had to show: (1) the facts pertaining to damages in this case were fully and fairly litigated in the AHC-Travelers case, (2) the facts pertaining to damages in this case were essential to the judgment in the AHC-Travelers case, and (3) that AHC and Wise were cast as adversaries in the first case. *See Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 579 (Tex. 2001).

Here, neither the judgment nor the pleadings from the companion case are part of the record. Consequently, it is unclear from the record whether the facts pertaining to damages in this case were fully and fairly litigated in the AHC-Travelers case. *See Jones v. City of Houston*, 907 S.W.2d 871, 874 (Tex. App.—Houston [1st Dist.] 1995, writ denied) (holding party relying on the doctrine of collateral estoppel is required to introduce into evidence both the judgment and pleadings from the prior suit); *see also Cuellar v. City of San Antonio*, 821 S.W.2d 250, 256 (Tex. App.—San Antonio 1991, writ denied) (same). Thus, the trial court did not abuse its discretion by refusing to give collateral estoppel effect to the damages awarded in the AHC-Travelers case. Accordingly, we overrule AHC's first issue.

### IV. Damages

16

In its third issue, AHC asserts that the jury's finding as to the difference in the market value of AHC's inventory immediately before and immediately after the fire was against the great weight and preponderance of the evidence. We agree.

## A. Standard of Review

When a party attacks the factual sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We consider all the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

## B. Market Value

Market value is the primary method of valuation in cases involving damage to personal property. *See Int'l-Great N. R.R. Co. v. Casey*, 46 S.W.2d 669, 670 (Tex. Comm'n App. 1932, holding approved). Market value is defined as the price property would bring when it is offered for sale by one who desires to sell, but is not bound to do so, and is bought by one under no necessity to purchase it. *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981); *Ford Motor Co. v. Cooper*, 125 S.W.3d 794, 799 (Tex. App.—Texarkana 2004, no pet.). The market value of property is determined at the place where the damage occurred. *See Thomas v. Oldham*, 895 S.W.2d 352, 359 (Tex. 1995). If the property has a market value, a

plaintiff's damages are measurable as the difference in market value immediately before and after the injury. *Id.*

## C. Analysis

At trial, Maddox testified that 490,092 hats, over $13 million in inventory, had been damaged by the fire and could not be sold. Startz, AHC's expert, testified that the replacement cost for AHC's inventory was $13,385,969.37. Based on the evidence presented by AHC at trial, AHC sought the replacement cost of its inventory and not the market value. *See Shaw Tank Cleaning Co. v. Tex. Pipeline Co.*, 442 S.W.2d 851, 854 (Tex. Civ. App.—Amarillo 1969, writ ref'd n.r.e.) (holding that if the property has no market value and can be replaced, replacement costs are the proper measure of damages); *see also Moran Corp. v. Murray*, 381 S.W.2d 324, 328 (Tex. Civ. App.—Texarkana 1964, no writ) (stating that it is the plaintiff's burden to show which method of valuation other than market value is appropriate). This conclusion is further supported by AHC's request for lost profits, which are not recoverable if market value is awarded. *See State v. Whataburger, Inc.*, 60 S.W.3d 256, 262 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (stating that any award for lost profits and the difference in market value constitutes a double recovery).

However, the trial court submitted, without objection by AHC, a jury charge on market value and not replacement cost. Thus, we must determine whether the evidence was sufficient to support the jury's award for market value. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001) (stating that an assessment

of the evidence "must be made in light of the jury charge that the district court gave without objection"); *see also City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) ("Since neither party objected to this instruction [regarding malice], we are bound to review the evidence in light of this definition.").

For the jury to have calculated AHC's damages based on market value, there had to be evidence of the value of AHC's inventory immediately before and immediately after the fire. *See Thomas*, 895 S.W.2d at 359. As both Wise and AHC point out, and we agree, the jury's $95,000 figure is apparently the difference between the inventory figures submitted for tax appraisal purposes in 2005 and those submitted in 2006 (that is, $200,000 and $105,000). The only other calculation resulting in a damage figure in any way similar to this again uses the 2005 tax figure ($200,000) and subtracts AHC's 2005 cost of goods sold ($106,016) found in Shipp's lost profits calculations, to yield a figure of $93,984. Either way, the jury's calculations require the use of AHC's 2005 inventory appraisal figure.

The inventory appraisal figure calculated sometime before January 1, 2005, and submitted to the taxing authorities for the January 1, 2005 date is certainly not immediately before the occurrence in question, which took place on November 27, 2005, approximately eleven months later. Nor is there evidence linking the 2005 appraisal figure to the value of AHC's inventory immediately before the fire. That is, there is no evidence that the value of AHC's inventory immediately before the fire was the same as the 2005 appraisal figure eleven months earlier.

19

The jury, however, heard Maddox testify that the value of AHC's inventory immediately before the fire was over $13 million. Although the evidence suggests that Maddox was referring to replacement costs and not market value, it is reasonable to infer that the market value of AHC's inventory would not be less than the cost to replace the inventory. The jury also heard that the umpire in the companion case determined that the value of AHC's inventory loss was $8,792,529. Even Dau, Wise's own expert, testified that AHC had market value damages in the amount of $355,663.14 and replacement costs of over $150,000. Finally, it was undisputed that AHC had 490,092 hats in its inventory at the time of the fire. Using the 2005 tax figure to calculate market value would result in a market value of approximately $0.41 per hat ($200,000/490,092). That amount is far less than the replacement cost per hat, which, based on the evidence presented at trial, ranges from $5.43 to $137.11 per hat. Thus, based on the record as a whole, we hold that the jury's finding as to market value is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. Accordingly, we sustain AHC's third issue.[12]

## V. Conclusion

Our resolution here does not expressly affect the liability portion of the trial court's judgment. However, under current Texas law, we are nevertheless required

---

[12] ... Because AHC's third issue is dispositive, we do not address AHC's second issue, nor do we reach Wise's cross-issues. *See* Tex. R. App. P. 47.1.

to remand this proceeding for a new trial on both liability and damages. That is, when liability is contested, as here,[13] we are not permitted to remand for a separate trial solely on unliquidated damages. *See* Tex. R. App. P. 44.1(b) (prohibiting a separate trial solely on unliquidated damages when liability is contested); *see also Estrada v. Dillon*, 44 S.W.3d 558, 562 (Tex. 2001) (stating party's failure to present on appeal an additional discrete challenge to liability when party challenges damages does not defeat plain language of rule 44.1(b)). Accordingly, we reverse the trial court's judgment and remand for a new trial.

BOB MCCOY
JUSTICE

PANEL: WALKER and MCCOY, JJ.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: October 14, 2010

---

[13] Wise contested its liability by challenging whether it acted negligently, asserting that the fire was the result of an Act of God, an unavoidable accident, condition, or situation as defined by Texas law.