

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-17-00457-CV

HEMINK FARMS, LTD., LAURENS SCHILDERINK, ILONA VAN VLIET A/K/A ILONA SCHILDERINK, AND HEMINK MANAGEMENT, LLC, APPELLANTS

V.

BCL CONSTRUCTION, LLC, APPELLEE

On Appeal from the 64th District Court
Castro County, Texas
Trial Court No. A10098-1608, Honorable Robert W. Kinkaid, Jr., Presiding

March 20, 2019

## MEMORANDUM OPINION

Before QUINN, C.J., and PIRTLE and PARKER, JJ.

Appellants Hemink Farms, Ltd., Laurens Schilderink, Ilona Van Vliet, and Hemink Management, LLC, appeal from the jury verdict and judgment in favor of BCL Construction, LLC, on its claims arising from the construction of a house near Hart, Texas. We affirm in part and reverse and render in part.

## Background

In 2012, BCL finished construction on a house for Schilderink and Van Vliet that another contractor had begun. The house was later sold and, in 2015, BCL was hired to build a new house for Schilderink and Van Vliet. The new home was to be a near-replica of the first one. It was constructed on property owned by Hemink Farms, a company which is owned by Schilderink and Hemink Management. Both Schilderink and Van Vliet, husband and wife, exercised control over the project and had power to make payments. There was no written contract.

The first house had been completed at a cost of approximately $1.3 million. Schilderink testified that his budget for the second house was $1.5 million. When Thomas Robertson, who was a subcontractor BCL hired to be the project manager, outlined a projected budget of $1.57 million, Schilderink said it was close enough, and to get started. Schilderink and his family were living in a rental property and wanted to move into the new house at the end of their one-year lease term. Robertson testified that the budget was "a starting point," because he did not have all the facts or any design. Both Robertson and Schilderink said that the parties agreed that BCL would build the house for cost plus a flat builder's fee of $200,000.

Construction on the house was soon underway. Over the course of the project, Schilderink and Van Vliet made changes to the design of the house and to the materials used. For example, they raised the pitch of the roof after construction had started, put in stamped concrete, added a theater room to the basement, built an indoor pool instead of an outdoor pool, upgraded finishes in the pool house, used solid cedar beams rather than

the faux beams used in the first house, increased the size of the garage, installed a "man cave" constructed with materials from an old barn which BCL gathered, and more. Also, some features of the house, such as cabinetry and millwork, were redone multiple times as a result of Schilderink and Van Vliet changing their minds or communicating contradictory instructions. This led to additional expenses. By the end of 2015, Hemink Farms had paid $1.678 million in construction costs. Steve Long, the owner of BCL, testified that as the project neared completion, Schilderink was slow in making payments. This caused Long to get behind in paying subcontractors. Long testified that when he sought assurances from Schilderink, Schilderink told him to "just finish, and I'll pay you." He believed Schilderink was withholding payment with the intent to get the project finished faster. Robertson also testified about the changes and additions made to the house and stated that "the overarching statement that Mr. Schilderink continued to make to me, was 'get these finished and I'll pay you.'"

The family moved into the house in March of 2016, by which time the project had reached substantial completion. Robertson had made a "punch list" of items that Schilderink and Van Vliet had identified as requiring completion or correction to finish the house, and BCL was working on those items in April 2016.

On April 27, 2016, Robertson met with Schilderink at Schilderink's Spandet Dairy office to discuss payment of two invoices which remained unpaid. The first, dated March 11, 2016, was for $197,683.43, and the second, dated April 22, 2016, was for $328,688.34. Schilderink told Robertson he was not expecting another bill, as he believed he had already paid too much. He testified, "I knew I was over the 1.5 million but I thought it was still fairly close and I – and I added it up. So we came to 2.1 million I

3

already paid and then I got $500,000-something thousand on top of that, I really got a shock of that [sic]." Robertson testified that Schilderink wanted to hold BCL to a $1.5 million budget even though he continued to order expensive items for the house. Robertson had brought the box of invoices for the project, but Schilderink did not want to review them. Schilderink indicated that he wanted to speak to Long, so Long came from Amarillo to join the meeting.

All three men testified at trial that, at the time of their April meeting, a dispute existed regarding payment. Schilderink offered to pay the smaller of the two still-due bills, but Long said that was not enough and that Schilderink needed to pay the larger bill. Eventually, Schilderink wrote BCL a check for $263,185, roughly half of the amount due under the two final bills. BCL deposited the check. Schilderink testified that Long agreed to "call it good" and took the position that the $263,185 payment was a final settlement. Long, however, testified that he did not agree to accept the check as a settlement of the two invoices.

No further payment was forthcoming, so Long eventually filed a mechanic's and materialman's lien against the property. BCL then filed suit against appellants, seeking foreclosure of the lien and alleging breach of contract, suit on a sworn account, quantum meruit, and promissory estoppel. Appellants asserted that BCL's claims were barred by the doctrines of accord and satisfaction and waiver. Hemink Farms filed counterclaims against BCL, alleging breach of contract and fraudulent lien filing.

Following a four-day trial, the jury found that all parties, BCL, Schilderink, Van Vliet, Hemink Farms, Ltd., and Hemink Management, LLC, had agreed that BCL would

4

construct the project and be paid construction costs plus a $200,000 builder's fee. The jury found for BCL against all four defendants on its theories of breach of contract, quantum meruit, and promissory estoppel. Additionally, the jury found that BCL and Hemink Farms, Ltd., had not reached a settlement agreement that Hemink Farms would pay $263,185 and receive a credit of $263,186.77. The jury awarded BCL $193,592.99 in damages, representing the amount owed after a partial payment and the punch list items credited by BCL, on BCL's contract claim and equitable claims. The jury also awarded BCL $72,546.50 in legal fees. Appellants filed a motion for judgment notwithstanding the verdict. The trial court entered judgment on the jury's verdict. After their motion for new trial was overruled by operation of law, appellants brought this appeal.

Analysis

Accord and Satisfaction

In their first two issues, appellants contend they established their affirmative defense of accord and satisfaction as a matter of law and the jury's failure to find an accord and satisfaction was against the overwhelming weight of the evidence.

The consequence of a finding of accord and satisfaction is a bar to any action on the original obligation. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979). The defense rests upon a new contract, express or implied, by which parties agree to discharge an existing obligation by means of a lesser payment tendered and accepted. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 863 (Tex. 2000). Appellants, as the movants on the defense of accord and satisfaction, were required to establish both (1)

the existence of a dispute, and (2) an unmistakable communication to BCL that tender of a reduced sum was upon the condition that acceptance would satisfy the underlying obligation. *Id.* BCL and appellants had to specifically and intentionally agree to the discharge of appellants' existing obligations. *Id.*

At trial, Long, Robertson, and Schilderink all testified that there was a dispute regarding the two outstanding invoices. Schilderink testified that he told Robertson he had already paid too much. Robertson testified that Schilderink told him he would never pay them a dime, that he would hire lawyers and string the matter out for years, and that someone would be going to jail if Long did not bring him a check. Long testified that he went to the April 27 meeting with Schilderink to collect the money he was owed, but he was aware that Schilderink felt he had been overcharged. He expected there would be some "bartering" over the invoices and that the meeting would be a "battle." When Long arrived at the meeting, Schilderink told him that Long should write a check for $250,000 to Schilderink. This evidence established the existence of a dispute.

Appellants contend they also met their burden to establish a specific and intentional agreement to discharge Schilderink's obligation. To show the necessary meeting of the minds, "[t]here should be a statement that accompanies the tender of the lesser sum, which statement also must be so clear and so explicit and so complete that the statement is simply not susceptible of any other interpretation but one of complete accord and complete satisfaction." *Pate v. McClain*, 769 S.W.2d 356, 362 (Tex. App.—Beaumont 1989, writ denied) (citing *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex. 1969)).

Appellants rely heavily on the $263,185 check to BCL, which BCL deposited, and the attached check stub, which stated a "credit," dated February 29, 2016, for $263,186.77, the remaining balance of the two invoices. Appellants argue that the check stub "clearly noted the parties' agreement." Schilderink testified that when he gave Long the check, he showed him the check stub and said, "See this is what we did, those two invoices added up, credit that number so this is the final amount." According to Schilderink, Long responded with, "That's okay."

However, Schilderink acknowledged that neither he nor Long used the words "full payment." He also acknowledged that he did not write "final payment" or "full payment" on the check and that Long did not write "paid" or "paid in full" on the bill. He testified:

Q: We've already talked about that Mr. Long didn't tell you he would take this 263,185.00 as payment in full, right?

A: He did take it as payment in full.

Q: He never told you that, did he?

A: He did not use the words but it says on the invoice with the credit on the invoice stub.

Q: Mr. –

A: We agreed on – on accepting that number and that is translation for paid in full. It – it says the two invoices minus the credit and he okayed that.

Q: You're saying the translation is "paid in full" that's your translation, correct?

A: No, that's not correct, that is – that is the same as paid in full if it says credit and he okayed that and we handshake and that is the same as paid in full.

Schilderink's testimony that there was an agreement to settle was controverted at trial. Long testified that, when Schilderink offered to pay the $197,000 invoice, he told

7

Schilderink that the amount was "not even close" to what he needed to pay the subcontractors. He asked Schilderink to pay the larger invoice, saying that would "get [him] by for now." When Schilderink refused to pay the invoice, Long then suggested that they add up the two invoices and that Schilderink pay half, with Long adding, "I said that will get [me] by." Long testified that when Schilderink brought him the check, he stuck it in his pocket. His secretary later deposited the check. He never told Schilderink that the partial payment would be considered as payment in full and that he never did anything to lead Schilderink to believe that he considered himself paid in full. Long further testified that he did not stamp the two outstanding invoices as "paid," as he had with all the other invoices generated during the project. The day after the meeting, Long stopped sending people to finish the punch list work because he did not want more work to be done until the matter was settled. He testified that he gave Schilderink some time to come to his senses, and when he did not hear from him, BCL filed liens on the property.

Robertson testified similarly. He said that both he and Long explained to Schilderink that subcontractors needed to be paid and that the amount owed to them was more than $328,000. When asked directly whether Long offered to take $328,000 as payment in full, Robertson answered, "Oh, no." BCL's evidence demonstrated that if Long accepted the lesser amount of $263,185 as payment in full, BCL would not only give up its $200,000 builder's fee, but would still owe money to the subcontractors who worked on the house. The jury also heard testimony from Dean Mason, a mutual acquaintance of Schilderink and Long, whom Schilderink had asked to help resolve the situation with Long. Although Schilderink testified that he told Mason the parties had settled, Mason testified that neither Schilderink nor Long mentioned any settlement to him.

8

The evidence offered in support of an accord and satisfaction must demonstrate that "*both parties agreed* the amount paid by the debtor to the creditor fully satisfied the entire claim." *Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 788 (Tex. App.—Dallas 2002, pet. denied) (emphasis added). Based on the foregoing, we cannot conclude that appellants established the existence of the specific and intentional agreement necessary for appellants to prove their affirmative defense of accord and satisfaction as a matter of law.

Appellants maintain that the check and check stub speak for themselves and constitute an unmistakable communication that acceptance of the check would result in satisfaction of appellants' obligation. We disagree. Appellants cite *Case Funding Network, L.P. v. Anglo-Dutch Petroleum Int'l, Inc.*, 264 S.W.3d 38, 51 (Tex. App.—Houston [1st Dist.] 2007, pet. denied), for their argument that where a creditor "obviously should understand that the check is tendered in full satisfaction" of the claim, acceptance of the check binds the creditor, regardless of an actual understanding. We observe that, unlike the present case, *Case Funding* involved checks that contained unmistakable accord and satisfaction language on both the front and back, and were accompanied by letters that stated the payment was tendered "in an effort to compromise any dispute," and emphasized, in bold and underlined text, that depositing the checks would constitute a release of liability and an accord and satisfaction. *Id.* The other cases cited by appellants also involve statements that were clearer and more conspicuous than the check stub at issue here. For example, in *Pileco, Inc. v. HCI, Inc.*, 735 S.W.2d 561, 561 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), the check negotiated by the creditor included the notation "By signature hereto, endorser acknowledges full, complete

9

and final settlement of all claims against payer." In *Hixson v. Cox*, 633 S.W.2d 330, 330-32 (Tex. App.—Dallas 1982, writ re'd n.r.e.), the check featured a restrictive endorsement, typed on both the front and the back, stating that the check constituted full and final payment of the account, and it was mailed with a letter stating that acceptance of the check constituted full settlement of the account. In *First State Bank v. Knapp*, 3 S.W.2d 468, 469 (Tex. Civ. App.—Amarillo 1928, no writ), the check-writer had written "Payment in full of note" and specifically told the bank cashier that the check was given in full payment of all sums due. And in *Indiana Lumbermen's Mut. Ins. Co. v. State*, 1 S.W.3d 264, 266 (Tex. App.—Fort Worth 1999, pet. denied), the tendered checks were accompanied by a letter explaining that they were tendered "in settlement" of the disputed amounts due.

We do not believe that the "credit" notation on the check stub was so clear, full, and explicit that BCL had to understand that it was conditioned on the premise that acceptance would constitute the full satisfaction of BCL's claims. Any inferences to be drawn from the check and check stub concerning the parties' intent to reach an accord and satisfaction were factual issues to be resolved by the jury. *Richardson v. Allstate Tex. Lloyd's*, 235 S.W.3d 863, 865 (Tex. App.—Dallas 2007, no pet.) (op. on reh'g). The jury, which heard evidence of the circumstances surrounding the meeting and the purposes the parties intended to accomplish, rejected appellants' contention that by accepting the check, BCL was releasing appellants from their obligations. The evidence before the jury supports its refusal to find an accord and satisfaction.

Accordingly, we conclude that the evidence does not establish accord and satisfaction as a matter of law and that the jury's finding that appellants failed to meet

their burden to establish the defense is not against the overwhelming weight of the evidence. We therefore overrule appellants' first and second issues on appeal.

In their third issue, appellants challenge the jury's answer awarding attorney's fees to BCL, as it was predicated on the breach of a contract that appellants contend was resolved by accord and satisfaction. As set forth above, we will not disturb the jury's finding that there was no accord and satisfaction. Therefore, we overrule appellants' third issue.

Parties to the Contract

By their fourth issue, appellants assert that the evidence was insufficient to support the jury's finding that an agreement existed between BCL and appellants Schilderink, Van Vliet, and Hemink Management for the construction project.[1] Appellants do not challenge the jury's finding that an agreement existed between BCL and Hemink Farms.

Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998)*, cert. denied*, 526 U.S. 1040, 119 S. Ct. 1336, 143 L. Ed. 2d 500 (1999). When we determine whether legally sufficient evidence

---

[1] Appellants also state that there is legally insufficient evidence to support the jury's finding of a breach of the contract, but their briefing only addresses the existence of a contractual relationship. Therefore, we will limit our review to the issue raised by appellants in their briefing. *See* TEX. R. APP. P. 47.1, 47.4.

supports a finding, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007). The evidence is legally sufficient if it constitutes more than a "scintilla" of evidence on which a reasonable juror could find the fact to be true. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

For a contract to exist, there must be an offer, acceptance, and consideration. *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—Amarillo 2008, pet. denied). The existence of an oral contract may be proved by circumstantial or direct evidence. *Id.* Courts consider the communications between the parties and the acts and circumstances surrounding those communications when determining the existence of an oral contract. *Id.*

BCL directs us to the following evidence presented at trial regarding whether Schilderink and Van Vliet were parties to the contract: when Schilderink was asked whether he or Hemink Farms hired BCL for the construction project, he answered that he and his wife hired BCL. Schilderink also testified that all payments on the house were authorized, and all checks were signed, by him or his wife. He testified that only he or his wife could make a decision not to pay. Additionally, BCL points to evidence that both Schilderink and Van Vliet exercised decision-making authority about the home's design and materials.

Considering the evidence in the light most favorable to the jury's finding and indulging every reasonable inference that would support the finding, as we must, we

12

conclude that the record reflects more than a scintilla of evidence that an agreement existed between BCL and appellants Schilderink and Van Vliet. We overrule appellants' fourth issue as to Schilderink and Van Vliet.

BCL acknowledges that there is little evidence of Hemink Management as a party to the contract. The only evidence regarding Hemink Management's role was evidence that Hemink Management is a part owner of Hemink Farms. We conclude that BCL did not produce more than a scintilla of evidence establishing the existence of a contract between BCL and Hemink Management. Therefore, we sustain appellants' fourth issue as to Hemink Management.

Equitable Claims

Appellants' fifth issue challenges the jury's findings in favor of BCL on its equitable theories of quantum meruit and promissory estoppel. After finding in BCL's favor on its equitable claims, the jury awarded BCL $193,592.99 in damages on both claims, the same amount it had awarded on BCL's contract claim.[2]

Quantum meruit is based on an implied agreement to pay for benefits received. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Promissory estoppel prevents a party from insisting upon its strict legal rights under the statute of frauds, when enforcing a non-compliant agreement would be necessary to

---

[2] The final judgment made clear that BCL is entitled to only one recovery of its damages and attorney's fees. As BCL acknowledged in its motion for entry of judgment, the jury awarded BCL the same amount under each liability theory. Therefore, BCL was not required to elect from among the three theories by the trial court.

13

avoid an injustice. *"Moore" Burger, Inc. v. Phillips Petro. Co.*, 492 S.W.2d 934, 936 (Tex. 1973).

First, appellants assert that BCL is not entitled to recover on its equitable theories because BCL's right to any further recovery is precluded by accord and satisfaction. Because we have previously concluded that the jury's refusal to find an accord and satisfaction is supported by the evidence, we overrule this point.

Next, appellants contend that BCL's equitable theories are inconsistent with and unavailable in light of the finding that there was a contract between BCL and Hemink Farms for the construction of the residence. BCL concedes that its equitable theories are not applicable given the finding of an existing contract. We agree. The right to recover under a theory of quantum meruit is independent of any contract. *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). Promissory estoppel is likewise unavailable when a contract covers the subject matter of the dispute. *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 655 (Tex. App.—Dallas 2015, no pet.).

The jury's finding that an agreement existed between BCL and Hemink Farms is not contested on appeal, and we have overruled appellants' issue challenging the jury's finding as to an agreement between BCL and Schilderink and Van Vliet. BCL is precluded from recovering damages, under equitable theories, for work which was the subject of a contract. *See Iron Mountain Bison Ranch, Inc. v. Easley Trailer Mfg., Inc.*, 42 S.W.3d 149, 161 (Tex. App.—Amarillo 2000, no pet.). Accordingly, we sustain appellants' fifth issue.

14

<u>Legal Fees</u>

The jury awarded BCL $69,046.50 in attorney's fees for preparation and trial, the exact amount sought by BCL. In their sixth issue, appellants contend the evidence was legally and factually insufficient to support the jury's award of legal fees.

BCL's claim for legal fees included $4,438 in legal assistant fees.[3] Appellants' first point under their sixth issue asserts that BCL failed to present legally sufficient evidence of each element required for the recovery of legal assistant fees. To recover payment for a legal assistant's time, a party must provide evidence of: (1) the legal assistant's qualifications through education, training, or work experience to perform substantive legal work; (2) substantive legal work that was performed under the direction and supervision of an attorney; (3) the nature of the legal work that was performed; (4) the hourly rate charged for the legal assistant; and (5) the number of hours expended by the legal assistant. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012). Here, appellants specifically claim that there was no testimony on the second element for paralegal fees, i.e., whether the substantive legal work was performed under the direction and supervision of an attorney.

BCL's attorney Tim Newsom testified regarding the attorney's fees BCL had incurred. He stated that he had a paralegal, Terri Harrison, work on this case. Newsom testified that when Harrison generates her monthly bills, which are based upon her daily time entries, he segregates her secretarial time and her paralegal time. He said he reviews billing statements internally and makes any necessary corrections before sending

---

[3] Although the evidence showed the amount of legal assistant fees BCL incurred to total $8,876, BCL sought only $4,438 in legal assistant fees at trial.

bills out to clients. Newsom then explained the final bills which were sent to Long, showing the date of the work, the timekeeper, the description, the time spent, the rate, and the total charge. The billing records submitted in evidence detail the nature of the work done by Harrison and reflect instances where Newsom gave instruction to her on tasks to be performed and reviewed the work she did. Newsom's testimony and the billing records indicate that Harrison's work was done under his direction and supervision. Considering all the record evidence in the light most favorable to the jury's verdict and indulging every reasonable inference from that evidence in support of the verdict, legally sufficient evidence exists to show the legal assistant performed substantive legal work under the direction and supervision of an attorney. We therefore overrule this point.

In their second point under their legal fees issue, appellants claim that the evidence only established attorney and legal assistant fees totaling $65,684.50, yet the trial court awarded $69,046.50 in fees, which appellants allege incorrectly includes court costs and other expenses.

The testimony given at trial contradicts this argument. Although appellants argue that Plaintiff's Exhibit 73 summarizes the fees sought by BCL, Newsom explained that the $65,684.50 in fees shown on Plaintiff's Exhibit 73 represented attorney's fees of $56,808.50 and paralegal fees of $8,876 charged to BCL as of July 17, 2017. He testified that BCL was not seeking to recover the court costs and other expenses shown on Exhibit 73. He further explained that Plaintiff's Exhibit 84 was a summary of the billing records in evidence showing the legal fees incurred by BCL through the date of his testimony, July 20, 2017. That amount included $56,808.50 in attorney's fees through July 18; $10,800 in attorney's fees incurred during the trial; paralegal fees of $4,438; and a credit

16

of $3,000 for a segregated claim. The jury's award of $69,046.50 corresponds exactly with the total amount on Plaintiff's Exhibit 84.

We find this evidence sufficient to support the award of attorney's fees. Appellants' sixth issue is overruled.

## Conclusion

We reverse the trial court's determination that there was a contract between BCL and Hemink Management. We also reverse the judgment in favor of BCL on its claims of quantum meruit and promissory estoppel because the existence of a valid contract bars those claims. Judgment is rendered that BCL take nothing on its breach of contract claim against Hemink Management and take nothing on its equitable claims. In all other respects, the trial court's judgment is affirmed.

Judy C. Parker<br>
Justice